Peter **QUARTARARO**, Petitioner,

v.

Dominic **MANTELLO**, Superintendent Wende Correctional Facility, and Robert Abrams, Attorney General of the State of New York, Respondents.

No. 88 CV 1013 (ERK).

United States District Court, E.D. New York.

June 19, 1989.

452

Vivian Shevitz, Georgia J. Hinde, New York City, for petitioner.

Patrick Henry, Dist. Atty., Suffolk County, by Mark D. Cohen, Chief, Appeals Bureau, Michael Miller, Glenn Green, Asst. Dist. Attys., Riverhead, N.Y., for respondents.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

On April 20, 1979, John Pius, Jr., a thirteen year old resident of Smithtown, New York, was murdered. Approximately seven months later, petitioner Peter Quartararo and his brother, Michael, were indicted and charged with the murder.[1] Petitioner and his brother were jointly tried, and following a six week jury trial in the Suffolk County Court, both defendants were convicted of two counts of murder in the second degree, intentional murder in violation of Penal Law § 125.25[1] and murder resulting from a depraved indifference to human life in violation of Penal Law § 125.25[2]. Petitioner, who was a few days short of his sixteenth birthday when the offense was committed, was sentenced to two concurrent terms of incarceration of nine years to life. The Appellate Division

of the Supreme Court unanimously affirmed petitioner's conviction. *People v. Quartararo*, 113 A.D.2d 845, 493 N.Y.S.2d 511 (2d Dep't 1985). Chief Judge Wachtler denied leave to appeal to the New York Court of Appeals on December 18, 1985. *People v. Quartararo*, 66 N.Y.2d 1042, 499 N.Y.S.2d 1040, 489 N.E.2d 1312 (1985).

On February 9, 1988, a petition for a writ of habeas corpus filed by petitioner's brother, Michael, was granted on the ground that he was denied the effective assistance of counsel. *Quartararo v. Fogg*, 679 F.Supp. 212 (E.D.N.Y.), *affirmed*, 849 F.2d 1467 (2d Cir.1988). Subsequently, petitioner filed this petition for a writ of habeas corpus. The petition alleges that he was taken into custody on April 28, 1979, eight days after John Pius was murdered, and that the questioning to which he was subjected led to admissions and confessions that were involuntarily made and erroneously admitted into evidence at his trial.

The circumstances surrounding the tragic death of John Pius and the events and proceedings that followed are exhaustively discussed in *Quartararo v. Fogg*, 679 F.Supp. at 213–23 (hereafter *Quartararo I*). Because petitioner's challenge to the validity of his conviction turns on the methods used to obtain a series of confessions during an eight hour period of time on April 28, 1979, the discussion here will focus primarily on the testimony at the pretrial hearing as it relates to the voluntariness of the confessions.

"As is almost invariably so in cases involving confessions obtained through unobserved police interrogation, there is a conflict in the testimony as to the events surrounding the interrogations." *Davis v. North Carolina*, 384 U.S. 737, 741, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966). The facts as set forth below are based upon the

---

1. Robert Brensic and Thomas Ryan were also subsequently convicted of murdering Pius. Brensic's conviction was affirmed by the Appellate Division, *People v. Brensic,* 119 A.D.2d 281, 506 N.Y.S.2d 570, (2d Dep't 1986), but was reversed by the Court of Appeals because the confession of Peter Quartararo was erroneously used as evidence against him. *People v. Brensic,* 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). Ryan's conviction was also affirmed by the Appellate Division. *People v. Ryan,* 121 A.D. 2d 34, 509 N.Y.S.2d 545 (2d Dep't 1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2202, 95 L.Ed.2d 857 (1987). The conviction was ultimately reversed for the same reason that the Court of Appeals reversed Brensic's conviction. *People v. Ryan,* 134 A.D.2d 300, 520 N.Y.S.2d 528 (2d Dep't 1987).

testimony of Detective Anthony Palumbo, who conducted the interrogation, the testimony of other Suffolk County detectives, or upon the findings of Judge Doyle who presided at the pre-trial hearing on the admissibility of the confessions.

## Statement of Facts

On the morning of April 28, 1979, eight days after John Pius was murdered, Detectives Richard Fountain and Richard LaValle were assigned to undertake surveillance of Michael O'Neil who was one of a number of persons suspected of participating in the murder. Detective Sgt. Jensen, who was directing the investigation, testified that the reason for the surveillance of O'Neil was to see "if we could put him together with either Thomas Ryan, Robert Brensic or Peter or Michael Quartararo." T. 416.[2] According to Jensen, it was "our feeling at the time that Ryan, Brensic and the Quartararo brothers were covering up for Michael O'Neil in the matter of this investigation." T. 417.

Detectives Fountain and LaValle were unable to locate O'Neil on April 28, 1979. They did, however, see "a yellow Capri which they believed was driven by Tommy Ryan ... and they believed it was heading toward O'Neil, so they followed the vehicle." T. 418. Ryan drove to petitioner's home, picked him up, and then drove to a delicatessen, at which time Fountain and LaValle ended their surveillance.

Subsequently, at about 1 P.M., after apprising Detective Sgt. Jensen of their observations, Fountain and LaValle were directed to relocate Ryan and to detain him for a witness "interview." Detectives Fountain and LaValle then returned to the delicatessen, where they spotted Ryan's car exiting the parking lot and directed Ryan to pull over. Within thirty seconds Detective Sgt. Jensen and Detective Gary Leonard arrived at the scene, stopping their car in front of Ryan's car. T. 419.

Detective LaValle was the first to approach petitioner. LaValle told petitioner "we were from the police. We were working on the Pius investigation. We needed help and we were expecting cooperation." Trial Tr. 1005. Petitioner and Ryan were then asked to accompany the police to the precinct's homicide office for questioning about the Pius murder. T. 420, 481. Ryan requested that he be allowed to drive to the police station. This request was denied, however, and Ryan rode to the station with Fountain and LaValle and petitioner rode with Jensen, while Leonard drove Ryan's car to the station.

Petitioner arrived at the police station at between 1:15 and 1:45 p.m., was taken through a rear entrance of the station and was brought to the juvenile aid room. T. 492. Petitioner's presence at the station was not officially recorded at this time. T. 493. Once placed in the juvenile aid room, petitioner was left alone, with the door open and with police personnel visible in the immediate vicinity of the doorway, for ten to fifteen minutes while Jensen located two homicide detectives, Anthony Palumbo and Gary Leonard, to question petitioner as a possible witness to the Pius murder.

Approximately one and one half hours after he was asked to accompany the police to the precinct house, petitioner's interrogation began. While Detective Reck, who was questioning Thomas Ryan, advised Ryan at the outset of the interrogation "that he was free to leave at anytime," *People v. Ryan*, 121 A.D.2d 34, 59, 509 N.Y.S.2d 545 (2d Dep't 1986), petitioner was never told he was free to leave, T. 21–22, and he was not given the *Miranda* warnings until some four hours into the interrogation. Instead, Detective Palumbo, who did most of the questioning, began the interview by informing petitioner that the police "had reason to believe that [he] may have witnessed" certain incidents involving Pius and three possible suspects, Michael O'Neil, John Sparling and Raymond St. Dennis. T. 11.

---

**2.** The pre-trial suppression hearing is contained in two separate consecutively numbered transcripts. References to "T" are to the transcript of the pre-trial hearing held between June 4 and June 12, 1980. References to Tr., June 16 to July 8, 1980, refer to the hearing held during these dates. References to "Trial Tr." are to the transcript of the trial.

Specifically, petitioner was told that these three suspects all placed petitioner and his companions at the Dogwood Elementary School on the evening that John Pius was murdered. T. 11–12.[3] Palumbo "appealed" to petitioner not to cover up for anyone and to "tell us exactly if he saw anything or if he knew anything, what exactly it was," that "he's obligated morally to come forward and tell us." T. 12–14.

Petitioner responded that he saw O'Neil, Sparling and St. Dennis on the night of the Pius murder at a beer distributor, where petitioner and his companions purchased some beer from one of the suspects. T. 14–15. Petitioner also recounted his participation in the theft of a minibike on that date. T. 15–16. Palumbo's questioning about these events was interrupted at approximately 3:30 p.m. when Detective Sgt. Jensen, who was questioning Ryan, called Palumbo to inform him of Ryan's statement that John Pius rode by Ryan's car on bicycle while the stolen minibike was being loaded into the trunk of Ryan's car. T. 19, 142.

After receiving this information from Jensen, Palumbo immediately "confronted [petitioner] with it," T. 20, and continued to plead with him not to cover up for the suspects. Specifically, Palumbo told petitioner that he was "obligated to tell us" what he knew. Palumbo "realiz[ed] they were friends of his in fact and the cover-up must end right there. He must tell." T. 21. Petitioner then stated that the three suspects Palumbo had in mind "in fact had nothing to do with the death of John Pius," that in fact Brensic and Ryan had killed Pius. T. 21.

Once petitioner implicated Brensic and Ryan in the murder of Pius, Palumbo asked petitioner to describe what occurred on the evening in question. T. 21. Once again petitioner described the theft of the minibike, including a verbal exchange between his brother and Pius. Then, prompted by Palumbo, petitioner expanded on his earlier story, describing how Brensic and Ryan, worried that Pius might report the theft, decided to find him and "talk" to him. T. 24–25. Petitioner said that he and his companions drove to the Dogwood Elementary School, where they "spotted John Pius driving towards the back of the school." T. 25. Ryan then parked his car and along with Brensic pursued Pius behind the school building, while petitioner and his brother remained in the car. T. 25. After a short time, Brensic and Ryan returned to the car "frightened, out of breath, excited," and described to petitioner and his brother the confrontation with Pius and the manner of his death. T. 25–26.

After petitioner completed his statement, Palumbo called Jensen to inform him of its content. T. 27. Jensen directed Palumbo to have petitioner produce a diagram of the school yard and indicate where various events described by him had occurred. T. 29. Palumbo was also directed to prepare a written statement of petitioner's account. T. 29. At approximately 4:30 p.m., after petitioner had been working on the diagram and reviewing it with Palumbo for approximately 30 minutes, Palumbo, who had not visited the sight where the body of Pius was discovered, was still unable to "totally visualize" what had been described by petitioner. T. 37. Accordingly, Palumbo asked that petitioner accompany Palumbo and Leonard to the Dogwood Elementary School. T. 37.

At approximately 5:30, petitioner was driven to various places that he had described during his questioning. T. 38–40. When petitioner arrived at the Dogwood Elementary School, he and Detectives Palumbo and Leonard got out of the car and proceeded to walk the grounds of the school. Although petitioner still claimed that he and his brother had remained in the car and that petitioner did not witness the actual confrontation between Brensic, Ryan and Pius, T. 42, Palumbo continued to plead with petitioner to divulge all he had witnessed. Petitioner eventually admitted

---

3. The body of John Pius was found by an embankment in the area of the Dogwood Elementary School.

that he and his brother had not remained in the car, but in fact had followed Brensic and Ryan, witnessing the confrontation and fight that ensued. T. 42. Specifically, petitioner said that Pius began screaming during the fight and that Brensic and Ryan stuffed rocks in his mouth "to shut him up." T. 43. According to petitioner, after Pius died, Brensic and Ryan dragged his body into the woods, burying it with leaves and sticks. T. 44–45.

Palumbo testified that, after implicating Ryan and Brensic, petitioner was "worried about ratting" on his friends. T. 149. "[T]rying to comfort" petitioner, Palumbo told him not to "worry" because "Ryan is over there confessing." T. 149–50. Moreover, Palumbo also told petitioner that Ryan was "burying the Quartararos"—petitioner and his brother Michael—and that therefore petitioner should "bury" Ryan. T. 215. Palumbo also acknowledged that he may have told petitioner "you're young enough that nothing is going to happen to you. We'll take care of you." T. 151.

Palumbo admitted that he deliberately lied to petitioner and that Ryan had not confessed or implicated petitioner or his brother. T. 141. Palumbo's tactics, however, succeeded in inducing petitioner to confess. At approximately 6:30 p.m., while still at the Dogwood Elementary School, petitioner stated that he and his brother had in fact participated in the murder of John Pius. T. 48.

Once petitioner made this admission, Palumbo "stopped him and immediately paraphrased his *Miranda* warning rights for him," T. 49, and then asked him whether he would continue to discuss the Pius murder with Palumbo. T. 51. According to Palumbo, petitioner indicated that "he wanted to continue on. He wanted to get it all cleared up, was his words, just wanted to get it off his chest." T. 51.

While they were returning to Palumbo's car, petitioner began to recount in detail the events surrounding Pius' murder. Specifically, petitioner described the decision to steal the minibike, the actual theft, the encounter with Pius during the theft, including Michael Quartararo's comments to Pius, the trip to the Quartararo home to hide the minibike, the decision to look for Pius, and the assault on Pius that ensued once he was found. T. 51–54. Most of this account was given after petitioner, Palumbo and Leonard had returned to the police car. T. 54.

Palumbo had a tape recorder in the car, and immediately upon entering the car he "put the tape in the machine without Peter's knowledge" and began recording his statements. T. 55. At approximately 7:00 p.m., Palumbo completed taping petitioner's detailed description of the Pius murder and petitioner's role in it. T. 63. The paraphrasing of petitioner's *Miranda* warnings, which petitioner denied took place, was not captured on the tape.

Sometime between 7:00 p.m. and 7:15 p.m., during a brief stop at a McDonald's, Palumbo attempted to call petitioner's mother who had filed a missing person report for him an hour earlier. T. 407. Palumbo was unable to reach her because the line was busy. Palumbo and Leonard then took petitioner back to the precinct house. T. 64. At approximately 7:20 p.m. Palumbo contacted petitioner's mother by telephone and asked her to come to the precinct house with her son Michael. T. 65.

While awaiting the arrival of Mrs. Quartararo, Palumbo continued to question petitioner and reviewed with petitioner the diagram he had drawn of the school yard. T. 66. Specifically, Palumbo asked petitioner (his memory refreshed by his visit to the school) to indicate on his diagram precisely where the events he had recounted to Palumbo had occurred. T. 66–67. During this period, petitioner also had his first contact with a juvenile services officer, Officer Yaede, who was asked to remain with petitioner. T. 68.

Mrs. Quartararo arrived at the precinct house with Michael at approximately 8:35 p.m. T. 69. Shortly afterward petitioner made a third confession. Judge Doyle, who presided at the pre-trial hearing on the admissibility of the confessions, described the circumstances under which the last confession was given:

Palumbo read Miranda warnings to the three Quartararos. They were asked if they understood their rights and acknowledged that they did. Michael was asked to leave the room and Peter was asked to relate to his mother the same story he had told Detective Palumbo—which he did. Michael Quartararo was returned to the room and, when advised of his brother's disclosures, admitted only to drinking beer and to stealing a minibike, but nothing more. Peter requested permission to speak with his mother privately and, in the presence of Officer Yaede, recanted his story.

*People v. Brensic, M. Quartararo, P. Quartararo,* No. 79–2678, at 8 (Cty.Ct. Sept. 23, 1980) [hereinafter Hearing Op.].

The conflicting testimony describing the events that followed is detailed in *Quartararo I,* 679 F.Supp. at 223–25. Suffice it to say here that the interrogation ended early the next morning with the administration of polygraph examinations to petitioner and his brother sometime between 1:00 a.m. and 5:00 a.m. Although petitioner had confessed to a brutal murder and had allegedly failed the polygraph, he was released without being charged with any offense. Petitioner was indicted seven months later. The evidence at trial consisted of his confessions and admissions and little else. *Quartararo I,* 679 F.Supp. at 221–23, 227.

## Discussion

Petitioner's principal contention here is that his various admissions and confessions were erroneously admitted into evidence at his trial. While these statements are inextricably linked to each other, a somewhat artificial division of them is necessary for a proper analysis of the issues relating to their admissibility at trial.

### A. *The First Confession*

Petitioner first admitted his complicity in the murder of John Pius after he had been in custody for five and a half hours. During this period, petitioner was subjected to four hours of incommunicado interrogation by two Suffolk County Detectives who concededly had failed to give him his *Miranda* warnings. The patent and deliberate fail-ure to follow the procedure mandated by the Supreme Court in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was alone sufficient to require the exclusion of this evidence.

The holding of Judge Doyle to the contrary is so clearly erroneous that even the District Attorney has abandoned any serious defense of it. Specifically, Judge Doyle concluded that petitioner was not "in police custody" until after he made his first confession at 6:30 p.m. Hearing Op. at 12. The basis for this conclusion was that "no evidence was presented to show" that petitioner was ever "viewed" by the Suffolk County Detectives who were interrogating him "as being in custody" until petitioner first incriminated himself. *Id.*

This reasoning simply cannot be reconciled with either the law or the facts. In *People v. Rodney P.,* 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967), which was decided almost twelve years before Judge Doyle ruled on the admissibility of the confession, the New York Court of Appeals held that, for the purpose of determining whether *Miranda* warnings had to be administered, a person was subject to custodial interrogation if he was physically deprived of his freedom in any significant way or if a reasonable person in the subject's position would have understood that his freedom was so restrained. In adopting an objective standard, which was "not solely dependent either on the self-serving declarations of the police officers or the defendant," *id.* at 9, 286 N.Y.S.2d 225, 233 N.E.2d 255, the Court of Appeals anticipated the holding of the Supreme Court in *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). There the Supreme Court, expressly relying on the reasoning in *People v. Rodney P.,* held that:

> A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.

468 U.S. at 442, 104 S.Ct. at 3151; *United States v. Hall,* 421 F.2d 540, 544–45 (2d

Cir.1969), *cert. denied,* 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970).

Applying this standard here, petitioner plainly was in custody when he first admitted his direct involvement in the murder of John Pius. Petitioner, who was then a few days short of his sixteenth birthday, had been stopped by the police five and a half hours earlier, he was told his cooperation was expected and he was taken in a police vehicle to the precinct house where he was subjected to continuous interrogation by two Suffolk County detectives for four hours. Unlike Thomas Ryan, who was picked up for questioning along with him, petitioner was never informed that he was free to leave. T. 21–22. *Compare Oregon v. Mathiason,* 429 U.S. 492, 493, 97 S.Ct. 711, 713, 50 L.Ed.2d 714 (1977); *California v. Beheler,* 463 U.S. 1121, 1122, 103 S.Ct. 3517, 3518, 77 L.Ed.2d 1275 (1983). Under these circumstances, a reasonable person in his position would not have understood that he was free to do so.[4]

While the Appellate Division observed that Judge Doyle "credited the police officers' testimony that Peter voluntarily consented to police questioning as a witness," *People v. Quartararo,* 113 A.D.2d at 848, 493 N.Y.S.2d 511, the record is devoid of any such finding. On the contrary, the testimony Judge Doyle credited shows that petitioner's detention "was in important respects indistinguishable from a traditional arrest." *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979); 1 W. Lafave and J. Israel, *Criminal Procedure,* § 6.6, at 495 (1984). Indeed, in *People v. Brensic,* 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d

1226 (1987), the Court of Appeals expressly held that petitioner's confession, which had been admitted against Robert Brensic, was unreliable because "it was obtained from a juvenile after lengthy custodial questioning ...," *id.* at 22, 517 N.Y.S.2d 120, 509 N.E. 2d 1226, and the District Attorney has finally abandoned the claim that petitioner was not in custody when he confessed. Tr. 9, December 19, 1988.

■ The alternative argument made by the District Attorney is based on Judge Doyle's finding that petitioner's first acknowledgment of complicity in the murder of John Pius was a "spontaneous admission" that did not come in response to interrogation. Accordingly, it is suggested that the confession is admissible even if the *Miranda* warnings were not given. This argument is likewise frivolous.

In *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court held that "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning" or to "words or actions on the part of the police," other than express questioning, if the police should know that such conduct is "reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300–01, 100 S.Ct. at 1689–90. This formulation reflects the sound judgment that the police "cannot be held accountable for the unforeseen results of their words or actions." *Id.* at 302, 100 S.Ct. at 1690. On the other hand, "where a police practice is designed to elicit an incriminating response from the accused, it is

---

**4.** Prior to his confession petitioner had been told that Thomas Ryan had confessed and was "burying" him. T. 214–15. Unless he was told otherwise, this alone would suggest to a reasonable person that he was not free to leave. 1 W. LaFave & J. Israel, *Criminal Procedure,* § 6.6 (1984); *People v. Rodney P.,* 21 N.Y.2d 1, 10, 286 N.Y.S.2d 225, 233 N.E.2d 255 (1967). In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), a case in which the defendant was told that he was free to leave and other circumstances confirmed this fact, the Supreme Court held that the police officer's "false statement about having discovered Mathiason's fingerprints at the scene ... has nothing to do with whether [he] was in custody for the pur-

pose of the *Miranda* rule." *Id.* at 495–96, 97 S.Ct. at 714. *Oregon v. Mathiason* was decided before the Supreme Court adopted a standard for determining custody that turns on "how a reasonable man in the suspect's position would have understood the situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). *See* 1 W. LaFave & J. Israel, *Criminal Procedure,* § 6.6, at 491–92 (1984). Accordingly, while the result in *Oregon v. Mathiason* would be the same after *Berkemer,* the continued validity of that part of that holding quoted earlier is open to question. Even if it does retain some validity and Detective Palumbo's false representation to petitioner is ignored, it is clear that petitioner was in custody.

unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 301–02 n. 7, 100 S.Ct. at 1690 n. 7.

Petitioner's admission of complicity in the murder of John Pius was not "the unforeseeable result[ ]" of Detective Palumbo's "words or actions." *Id.* at 302, 100 S.Ct. at 1690. Whether petitioner was perceived as a witness or a target when he was initially taken into custody, once he admitted his participation in the theft of the minibike and that he was a witness to the assault on John Pius, Detective Palumbo had good reason to believe that petitioner was "probably involved" in the murder and that he was interrogating a suspect who was likely to incriminate himself. Tr. 24, December 19, 1988. Moreover, as the District Attorney concedes, the tactics employed by Detective Palumbo, including the suggestion that petitioner "bury" Ryan because Ryan was "burying" him, and Detective Palumbo's assurance that "you're young enough that nothing is going to happen to you," were obviously intended to elicit a confession. Tr. 14, December 19, 1988.

Under these circumstances, even if petitioner's confession came in response to a statement instead of a question, it was a reasonably foreseeable consequence of conduct intended to induce an incriminating response. *Alexander v. Connecticut*, 876 F.2d 277, 283 (2d Cir.1989); *People v. Guerra*, 30 A.D.2d 659, 291 N.Y.S.2d 580 (2d Dep't 1968), *aff'd*, 25 N.Y.2d 869, 303 N.Y. S.2d 882, 250 N.E.2d 874 (1969), *cert. denied*, 397 U.S. 914, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970). The failure to give the *Miranda* warnings before subjecting the petitioner to such custodial interrogation or its functional equivalent required the suppression of his confession.

5. Section 724 of the Family Court Act provides, inter alia, that a police officer who takes a juvenile into custody "shall immediately notify the parent ... that he has been taken into custody" and permits questioning "for a reasonable period of time" in the absence of the parent only *after* the police have made "reasonable effort" to first notify the parent. *See In re Raphael A.*, 53 A.D.2d 592, 385 N.Y.S.2d 288 (1st

This is not the only reason, however, why suppression of the confession was required. The absence of the *Miranda* warnings is only one of a number of factors that lead to the conclusion that the defendant's confession was a product of the kind of interrogation that offends the Due Process Clause. *Clewis v. Texas*, 386 U.S. 707, 709, 87 S.Ct. 1338, 1339, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). While the Supreme Court has framed the legal inquiry

> through the "convenient shorthand" of asking whether the confession was "involuntary", *Blackburn v. Alabama*, 361 U.S. 199, 207 [80 S.Ct. 274, 280, 4 L.Ed. 2d 242] (1960), the Court's analysis has consistently been animated by the view that "ours is an accusatorial and not an inquisitorial system," *Rogers v. Richmond*, 365 U.S. 534, 541 [81 S.Ct. 735, 739, 5 L.Ed.2d 760] (1961), and [ ] accordingly, tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness.

*Miller v. Fenton*, 474 U.S. 104, 109–10, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). Under this analysis, "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." *Id.* at 116, 106 S.Ct. at 452–53.

█ Petitioner, a juvenile who had no prior experience with the criminal process, was subjected to lengthy incommunicado interrogation in violation of New York law. Family Court Act § 724.[5] While the age of a criminal defendant does not necessarily

Dep't 1976). While a violation of section 724 would not provide a basis for granting the petition, it does set a standard for interrogating juveniles and is of some relevance in determining "whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means...." *Miller v. Fen-*

render him incapable "of that free choice of action which, in the eyes of the law, makes a confession 'voluntary,'" *Haley v. Ohio*, 332 U.S. 596, 603, 68 S.Ct. 302, 305, 92 L.Ed. 224 (1948) (Frankfurter, J., concurring), the Supreme Court has noted the importance a defendant's age plays in the consideration of the voluntariness of his confession. *Id.* at 599–600, 68 S.Ct. at 303–304. Specifically, addressing the voluntariness of a confession obtained from a fifteen year old who had been questioned for about five hours from midnight to dawn, the Supreme Court held that:

> The age of petitioner, the hours when he was grilled, the duration of his quizzing, the fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights combine to convince us that this was a confession wrung from a child by means which the law should not sanction. Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law.

*Id.* at 600–01, 68 S.Ct. at 304.

Petitioner was approximately the same age as Haley at the time of his confessions,

he was questioned for at least four hours prior to his first confession (although the questioning from midnight to dawn followed rather than preceded the confessions at issue here), he was not advised of any of his constitutional rights, and he was not accompanied by counsel, friends or family. Moreover, these circumstances are not diluted by any showing that petitioner acted coolly or callously during questioning or that he had past experiences with the police. On the contrary, Detective Palumbo referred to petitioner's nervous conduct and testified that petitioner was upset and crying. T. 48, 220.

The "final and most critical circumstance", however, is "the law enforcement officers' conduct." *Green v. Scully*, 850 F.2d 894, 902 (2d Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988). Prior to petitioner's confession, Palumbo told petitioner that one of his friends, Thomas Ryan, had already "confessed to the murder of Pius," T. 147–48,[6] and that Ryan was "burying the two Quartararos and therefore they should bury Brensic and Ryan." T. 214–15.[7]

The suggestion that Ryan had made such a confession, which was untrue, was also

---

ton, 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). The Supreme Court has taken note of violations of local law in its confession cases, *Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967), and in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), it described *People v. Saiz*, 620 P.2d 15 (Colo.1980), which involved "two hours of unwarned custodial interrogation in violation of state law requiring parent's presence, culminating in a visit to the scene of the crime," as a case which "raise[d] Fifth Amendment and Due Process concerns." 470 U.S. at 312, n. 3, 105 S.Ct. at 1295, n. 3.

**6.** Palumbo testified as follows:

Q. And you specifically remember that in answer to some question or in response that you made that you related yesterday that you told Peter Quartararo that Ryan had confessed to the Pius murder and that that was at 6:30 when you told him?

A. In substance, yes. It was around 6:30. That's correct.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. What are the words that you utter to Peter Quartararo with reference to Ryan's confession, words?

A. In substance I made him aware in fact that he knew Ryan was being spoken to by other

officers. I recalled to his recollection that in fact if he remembers one of the members of the police department called me and told me Ryan was telling them all about the Pius murder. And in fact I related to him about the minibike on Rice Lane and about John Pius going by.

And I—The only thing I was able to tell him is what I told him about the minibike on Rice Lane, and Pius going by. I'm trying to comfort him because he's worried about ratting. I told him don't worry about ratting. Ryan is over there confessing it. That's how we know about the minibike, and so on. Just trying to put him at ease at that point.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. And at that point in time had Quartararo, according to you, already told you that he, together with Michael, together with Brensic, and together with Ryan, had attacked and killed the Pius boy?

A. No. It was shortly after that. T. 148–50.

**7.** Palumbo testified as follows:

Q. Were there never any words uttered by you with reference to the fact that Brensic and Ryan were burying the two Quartararos and therefore they should bury Brensic and Ryan, or he should—Peter Quartararo?

accompanied by a promise of leniency. While Judge Doyle concluded that "there was no showing" that any promises were made to petitioner, Hearing Op. at 12, this conclusion is flatly contradicted by the "record as a whole." 28 U.S.C. § 2254(d)(8). Petitioner testified that Detective Palumbo told him nothing would happen to him and his brother "because we were juveniles and the other guys would take the rap for it," Tr. 679, June 16 to July 8, 1980, and that he agreed to confess after he was told that "everything would be all right and the other guys would get in trouble and me and my brother would just walk." Tr. 716–17, June 16 to July 8, 1980. Petitioner's testimony was corroborated by Detective Palumbo, who conceded that he "may have" assured petitioner "in words and sum and substance" that "you're young enough that nothing is going to happen to you," T. 151,[8] and by other evidence that persuaded the New York Court of Appeals that petitioner's confession "was given under circumstances which suggest that it was induced by the hope of leniency." *People v. Brensic*, 70 N.Y.2d 9, 22, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987). Specifically, the Court of Appeals observed:

> [Petitioner] admitted participation in the murder after Detective Palumbo told him in the schoolyard that Brensic and Ryan would be tried for murder, and that he would have to testify against them. He then replied "I may as well tell the truth." Thus, the possibility exists that Peter thought that only defendant and Ryan would be charged, and his involvement would be limited to testifying as a prosecution witness. Following Peter's

A. Counselor, you asked me this before. I made reference to saying that about Ryan. Yes, sir. I did. But not about Brensic. T. 214–15.

**8.** Palumbo testified as follows:
Q. Did you have occasion to say to Peter that, in words and sum and substance, since they've already told us that you and your kid brother did it, you're young enough that nothing is going to happen to you. We'll protect you. We'll take care of you. Use any words like that?
A. I may have, sir. I wouldn't deny it. I don't recall it, but I may have.

confession, he and his brother were not charged, and when they left the precinct the police expected that they would cooperate with the investigation. Moreover, there is no evidence that Peter Quartararo was specifically told that, if he confessed, he would be tried for murder. Palumbo testified that he did not tell Peter he would go to jail for what he was admitting. Significantly, on cross-examination at the admissibility hearing Palumbo stated that, prior to his recantation of the confession, Peter pleaded with his brother to confess saying "Mike, I told him everything. Please tell the cops. Please tell him everything. *Let's get out from under this*" (emphasis supplied). There also was evidence that, after his son recanted his confession, Mr. Quartararo urged him to tell the truth "to save your skin".

*People v. Brensic*, 70 N.Y.2d at 21–22, 517 N.Y.S.2d 120, 509 N.E.2d 1226.[9]

■ Confessions obtained by misrepresentation or promises of leniency are not per se involuntary if the effect of these tactics are "dissipated by the presence and advice of counsel," *Brady v. United States*, 397 U.S. 742, 754, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970), by a proper appraisal of the defendant's constitutional rights, *United States v. Ceballos*, 812 F.2d 42, 51 (2d Cir.1987); *United States v. Pomares*, 499 F.2d 1220, 1222 (2d Cir.), *cert. denied*, 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974), or if the evidence clearly shows that the confession was motivated by reasons other than the coercive influence of police conduct. *Green v. Scully*, 850 F.2d at 903–04.[10]

T. 151.

**9.** While the Court of Appeals was specifically addressing the third confession made by petitioner, the factors it enumerated are obviously applicable to all three.

**10.** In *Green v. Scully*, 850 F.2d 894 (2d Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988), the Court of Appeals expressed concern about exaggerations or misrepresentations concerning evidence against a criminal defendant. There the Court of Appeals noted that such conduct made "the issue of voluntariness ... a close one," even though there the defendant was a "streetwise" twenty

These factors are not present here. On the contrary, this is a case like *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897), where "a confession [was] given by a defendant in custody, alone and unrepresented by counsel.... [and] even a mild promise of leniency was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess." *Brady*, 397 U.S. at 754, 90 S.Ct. at 1472; *see Green v. Scully*, 850 F.2d at 901; *United States v. Fisher*, 700 F.2d 780, 783 (2d Cir.1983).

▬▬ The promise of leniency here was not a "mild" one. On the contrary, it was the equivalent of a promise of immunity. "Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." *Shotwell Manufacturing Co. v. United States*, 371 U.S. 341, 347–48, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963); *United States v. Fisher*, 700 F.2d at 783. This factor alone would make it difficult to conclude that the prosecution sustained its burden of proving by a preponderance of the evidence that the first confession was voluntary.[11] When taken together with other circumstances alluded to here, there is only one conclusion. The confession was obtained in violation of "the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Miller v. Fenton*, 474 U.S. at 110, 106 S.Ct. at 449. Judge Doyle's failure to exclude it was plainly erroneous.

### B. *The Second Confession*

When petitioner acknowledged his participation in the assault on Pius, Detective Palumbo allegedly paraphrased the *Miranda* warnings and asked if petitioner "wanted to continue on." T. 51. Petitioner answered affirmatively and Palumbo renewed his interrogation of petitioner. The questioning that followed gave rise to the tape recorded confession of petitioner that was ultimately used to impeach his credibility when he testified at trial. Although Judge Doyle instructed the jury that this confession was to be considered only for the purpose of assessing petitioner's credibility and could not be "considered as affirmative evidence," Trial Tr. 2983,[12] he later gave the following assessment of the impact of the tape:

Q. Now did that in any way change the complexity of the case and what had occurred in the case up to that point?

A. Absolutely.

Q. In what way and I would ask you specifically in terms of the defendant, Michael Quartararo?

A. The statement made by Peter ... was a [tape] recorded statement.... That statement, in the nature of question and answer, was powerful, powerful evidence....

Doyle Dep. at 21–22.[13]

Whether this tape recorded confession was admissible even to impeach petitioner's credibility depends on whether it was voluntarily made. In *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), the Supreme Court held that where, as here, "a prior statement is actually

---

three-year old who had two previous arrests and one experience of investigative questioning, and was given *Miranda* warnings prior to his interrogation. *Id.* at 903.

11. Under New York law, the District Attorney had the burden of proving that the confession was voluntary beyond a reasonable doubt. *People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965). The Constitution, however, requires that voluntariness be established by a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

12. Judge Doyle held that the statement was inadmissible because it was obtained in violation of section 724 of the Family Court Act.

13. The testimony by Judge Doyle was given at a deposition taken by the District Attorney in *Quartararo I* and is quoted at 679 F.Supp. at 230. While Judge Doyle's assessment of the impact of the tape related to the case against Michael, there is no reason to believe that it did not have the same impact on the case against petitioner. Indeed, without petitioner's confessions there was less evidence against him than against his brother.

coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310, 105 S.Ct. at 1293.

■■■ Because the only interruption in the beat of Detective Palumbo's interrogation, after petitioner's initial inculpatory statement, was the paraphrased *Miranda* warnings, the question here is whether the *Miranda* warnings given to petitioner were sufficient to prevent the coercion that induced the first confession from being "carried over into the second confession." *Id.* at 310, 105 S.Ct. at 1293 (citing *Westover v. United States*, decided together with *Miranda v. Arizona*, 384 U.S. 436, 494, 86 S.Ct. 1602, 1638, 16 L.Ed.2d 694 (1966); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967)). If they were not, then the taped confession could not properly have been used to impeach his credibility. *See New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

■■■ *Westover v. United States*, decided together with *Miranda v. Arizona*, 384 U.S. 436, 494, 86 S.Ct. 1602, 1638, 16 L.Ed.2d 694 (1966), is dispositive. After being subjected to fourteen hours of custodial interrogation by the Kansas City police without having been apprised of his rights, petitioner was taken into custody by the F.B.I. The record showed that Westover first confessed after he was turned over to the F.B.I. and that the F.B.I. agents gave him warnings comparable to those required by *Miranda* at the outset of the interview. The Supreme Court held that these warnings were insufficient to dissipate the coercive pressure to which he had been subjected because "from Westover's point of view the warnings came at the end of the interrogation process." *Id.* at 496, 86 S.Ct. at 1639. Specifically, the Supreme Court observed:

[I]n obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege.

*Id.* at 494, 86 S.Ct. at 1638.

This language is more compelling here because unlike *Westover*, which arguably involved only a failure to apprise the defendant of his rights, *Miranda v. Arizona*, 384 U.S. at 457, 86 S.Ct. at 1618, this case involves a confession that was the result of "deliberate means calculated to break the suspect's will." *Oregon v. Elstad*, 470 U.S. at 312, 105 S.Ct. at 1294. Petitioner initially confessed after being told that he had been implicated by his accomplices and after being promised that "you're young enough that nothing is going to happen to you." T. 151. The effect of such tactics on a juvenile, who had been in custody for five and a half hours and subject to continuous interrogation for four hours, cannot be dissipated simply by interrupting the confession and belatedly apprising him of his *Miranda* rights. Indeed, as previously noted, the New York Court of Appeals, speaking specifically to the third confession which was given after petitioner's mother arrived, and after yet another set of *Miranda* warnings, found that the confession "was given under circumstances that suggest that it was induced by the hope of leniency." *People v. Brensic*, 70 N.Y.2d 9, 23, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (1987).

Moreover, the argument for suppression of the taped confession is stronger here than in *Westover* because, unlike Westover, who had not succumbed to the pressure of custodial interrogation prior to being apprised of his rights, petitioner had already made an involuntary confession. One of the "principal reason[s] why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has little to lose by repetition." *Darwin v. Connecticut*, 391 U.S. 346, 350, 88 S.Ct. 1488, 1490, 20 L.Ed.2d 630 (1968) (Harlan, J., concurring in part and dissenting in part); *see United States ex rel Stephen J.B. v. Shelly*, 430 F.2d 215, 218–19 (2d Cir.1970).

Where the initial confession was obtained by techniques that violate the Fourteenth Amendment's guarantee of fundamental fairness, it would not be productive of "good police work, nor fair to a suspect, to allow the erroneous impression that he has nothing to lose to play the major role in a defendant's decision to speak a second or third time." *Darwin v. Connecticut*, 391 U.S. at 350–51, 88 S.Ct. at 1490–91 (Harlan, J., concurring in part and dissenting in part). Accordingly, "when the prosecution seeks to use a confession uttered after an earlier one not found to be voluntary, it has ... the burden of proving not only that the later confession was not itself the product of improper threats or promises or coercive conditions, but also that it was not directly produced by the existence of the earlier confession." *Id.* at 351, 88 S.Ct. at 1490; *see Harrison v. United States*, 392 U.S. 219, 225 n. 12, 88 S.Ct. 2008, 2011 n. 12, 20 L.Ed.2d 1047 (1968); *United States ex rel Stephen J.B. v. Shelly*, 430 F.2d 215, 218–19 (2d Cir.1970).[14]

The District Attorney here has not only failed to meet his burden of proving that the second confession "was not itself the product of improper threats or promises or coercive conditions," he has also failed to establish that it was not "directly produced by the existence of the earlier confession." Indeed, the first and second confessions were essentially a single confession by an emotionally distraught teenager that was interrupted only by the belated effort of Detective Palumbo to comply with *Miranda*. Once having admitted his complici-ty in the assault on John Pius in the belief that nothing would happen to him, it is unlikely that he thought he had anything more to lose by continuing. *Darwin v. Connecticut*, 391 U.S. at 350–51, 88 S.Ct. at 1490–91 (Harlan, J., concurring in part and dissenting in part). Under these circumstances, it seems plain that Judge Doyle erroneously permitted the taped confession to be used to impeach petitioner's credibility when he took the stand.

██ The District Attorney, however, asserts that petitioner failed to properly present the issue of the voluntariness of the taped confession at trial or on appeal from the judgment of conviction and that this failure to exhaust state remedies requires the dismissal of the petition. This claim is without merit. Petitioner challenged the voluntariness of the taped confession in his pre-trial motion to suppress and he argued on appeal that an involuntary confession "was inadmissible, even for impeachment purposes." App.Div.Br. at 51. In so doing, he afforded the New York State courts an opportunity to review the challenge to the voluntariness of the confessions and he created a complete factual record relating to that issue. *Rose v. Lundy*, 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982).

██ While it is true that Judge Doyle held that the taped confession was inadmissible on other grounds and he did not say, in *haec verba*, that he found the taped confession to have been voluntarily made, the District Attorney concedes that

14. This rule survives the decision of the Supreme Court in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). There the Supreme Court held that, where the initial confession is otherwise *voluntarily* made and is subject to attack only because Miranda warnings were not given, "[n]o further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver." *Id.* at 318, 105 S.Ct. at 1298. Justice O'Connor, who wrote the opinion in *Elstad*, however, acknowledged the "vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and *the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoer-cive question, as in this case." Id.* at 312, 105 S.Ct. at 1295 (emphasis supplied). Petitioner's first confession here is clearly not "a 'guilty secret' freely given in response to an unwarned but noncoercive question." On the contrary, this case is very much like the cases Justice O'Connor distinguished from *Elstad* where "an initial unwarned statement [was] obtained through overtly or inherently coercive methods which raise serious Fifth Amendment and due process concerns." *Id.* at n. 3. Indeed, two of the cases so cited involved initial confessions obtained from youthful offenders under circumstances that were arguably less coercive than those present here. *See id.* (citing *People v. Saiz*, 620 P.2d 15 (Colo.1980); *State v. Badger*, 141 Vt. 430, 450 A.2d 336 (1982)).

such a determination is implicit from his ruling that the confessions that preceded and followed the taped confession were voluntary and from his decision to suppress the taped confession on other grounds. Supp. Memo. of Law at 3. Contrary to the District Attorney's arguments, *id.* at 5, there was no need for petitioner to repeat the argument on voluntariness that had already been made earlier and rejected when he challenged the use of the taped confession for impeachment purposes at trial or on appeal.[15] Under the circumstances, petitioner adequately exhausted his state remedies. *See United States ex rel. Leeson v. Damon,* 496 F.2d 718, 720–21 (2d Cir.), *cert. denied,* 419 U.S. 954, 95 S.Ct. 215, 216, 42 L.Ed.2d 172 (1974).

▮▮▮ Moreover, petitioner no longer has a vehicle for raising the issue under the New York Criminal Procedure Law. If the issue was adequately preserved and argued on appeal he could not move to vacate the conviction. C.P.L. § 440.10(2)(a); *People v. Calo,* 31 A.D.2d 550, 295 N.Y.S.2d 501 (2d Dep't 1968). On the other hand, if the issue was inadequately preserved by timely objection or if petitioner failed to raise the issue on appeal he would also be precluded from raising it in a motion to vacate the judgment of conviction. The failure to timely object would be deemed to constitute a procedural forfeiture of the right to assert the issue, *see People v. Gates,* 36 A.D.2d 761, 319 N.Y.S.

2d 569 (2d Dep't 1971); *Gates v. Henderson,* 568 F.2d 830, 836 n. 2 (2d Cir.1977) (en banc), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978), and the failure to raise the issue on appeal, where sufficient facts appeared on the record to permit adequate review, would compel the denial of a motion pursuant to C.P.L. § 440.10(1) to vacate the judgment of conviction. *See* C.P.L. § 440.10(2)(c); *People v. Cooks,* 67 N.Y.2d 100, 103, 500 N.Y.S.2d 503, 491 N.E.2d 676 (1986); *Mills v. Scully,* 826 F.2d 1192, 1197 n. 1 (2d Cir.1987); *Roman v. Abrams,* 822 F.2d 214, 222 (2d Cir.1987), *cert. denied,* — U.S. ——, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989). Because there are no remedies available for petitioner to exhaust, the petition is not subject to dismissal even if petitioner had otherwise failed to exhaust his state remedies. *Daye v. Attorney General,* 696 F.2d 186, 190 n. 3 (2d Cir.1982) (en banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

▮▮▮ The District Attorney's alternative argument that petitioner forfeited his right to raise the issue by failing to timely object at trial or by not adequately arguing it on direct appeal is likewise without merit. On the record here, there is no reason to believe that the New York courts would apply a procedural forfeiture rule. C.P.L. § 470.05(2); *People v. Guerra,* 30 A.D.2d 659, 291 N.Y.S.2d 580 (2d Dep't 1968), *aff'd,* 25 N.Y.2d 869, 303 N.Y.S.2d 882, 250

---

**15.** Petitioner testified that he had been given *Miranda* warnings only before the confession made in the presence of his mother. Consistent with his testimony, petitioner argued in his brief on appeal that all statements prior to that time should have been suppressed because of the failure of the police to have given him the *Miranda* warnings. Petitioner also argued that his confessions and admissions were not voluntary, "an inquiry that requires far more than a mere determination as to whether or no [sic] the confession or admission was made after *Miranda* warnings," citing *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), App.Div.Br. at 35, and he made it clear that this argument applied to all statements made after he was given *Miranda* warnings. *Id.* at 36. Subsequently, in Point VIII of his brief, petitioner argued that the probative value of the taped confession for impeachment purposes was outweighed by its prejudicial effect and that:

In addition, in *Mincey v. Arizona,* 437 U.S. 385 [98 S.Ct. 2408, 57 L.Ed.2d 290] (1978), the Supreme Court specifically held that evidence which violated traditional voluntariness standards was inadmissible, even for impeachment purposes.

App.Div.Br. at 51.

The Appellate Division's rejection of this claim may be implied from its affirmance of Judge Doyle's determination that the confessions that preceded and followed the taped confession were properly admissible and from the following concluding sentence of the Appellate Division opinion: "We have considered defendants' other assertions and find them to be lacking in merit." 113 A.D.2d at 850, 493 N.Y.S.2d 511; *see People v. Calo,* 31 A.D.2d 550, 295 N.Y.S.2d 501 (2d Dep't 1968).

N.E.2d 874 (1969), *cert. denied*, 397 U.S. 914, 90 S.Ct. 919, 25 L.Ed.2d 96 (1970); *cf. United States v. Colombo*, 869 F.2d 149, 151 (2d Cir.1989). Accordingly, it would be inappropriate to infer that the Appellate Division's rejection of petitioner's claim was based on his alleged failure to object at trial or adequately argue it on appeal. *See Harris v. Reed*, ⸺ U.S. ⸺, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989).

### C. *The Third Confession*

■■■■■ Detective Palumbo's testimony indicates that he completed taping petitioner's second confession at approximately 7:00 p.m. T. 63. Once petitioner completed his second taped confession, he was taken to a fast-food restaurant and Palumbo attempted to contact petitioner's mother by telephone. T. 64. After fifteen minutes, petitioner had arrived back at the precinct house, where Palumbo was finally able to reach Mrs. Quartararo. T. 65. During the remainder of the period preceding Mrs. Quartararo's arrival at approximately 8:35 p.m., Palumbo continued to question petitioner about the incident, specifically asking him to indicate on the diagram drawn by the petitioner the precise location of the various incidents he had related. T. 66–67.

After Mrs. Quartararo arrived, *Miranda* warnings were administered to petitioner and his mother, and they agreed to talk to him without a lawyer. T. 72. Detective Palumbo testified that Mrs. Quartararo then began interrogating her son, T. 73. Judge Doyle, however, credited Mrs. Quartararo's testimony that petitioner's third and final confession, which he immediately repudiated, came after "Detective Palumbo told my son to tell me exactly what he had just finished telling him." Tr. 500, June 16 to July 8, 1980.[16]

The same considerations that compel the conclusion that the second confession was involuntary apply equally to the third. Where, as here, petitioner was told to repeat his prior involuntary confession, it is simply impossible to say that the confes-

sion so elicited was "not directly produced by the existence of the earlier confession." Moreover, while the presence of the defendant's mother and the administration of the *Miranda* warnings might under some circumstances be sufficient to dissipate the effect of impermissible tactics used to elicit an earlier confession, more is required before a juvenile is asked to repeat a prior confession that has been induced by the tactics employed here. At the very least, petitioner should have been told that the prior promise of leniency was no longer valid and that, if he again confessed, he would be prosecuted and the confession used to convict him. *United States ex rel. Stephen J.B. v. Shelly*, 430 F.2d 215, 218–19 (2d Cir.1970).

No such admonition was given here. On the contrary, as the New York Court of Appeals observed:

> [T]here is no evidence that Peter Quartararo was specifically told that, if he confessed, he would be tried for murder. Palumbo testified that he did not tell Peter he would go to jail for what he was admitting. Significantly, on cross-examination at the admissibility hearing Palumbo stated that, prior to his recantation of the confession, Peter pleaded with his brother to confess saying "Mike, I told him everything. Please tell the cops. Please tell him everything. *Let's get out from under this*" (emphasis supplied). There also was evidence that, after his son recanted his confession, Mr. Quartararo urged him to tell the truth "to save your skin."

*People v. Brensic*, 70 N.Y.2d at 21–22, 517 N.Y.S.2d 120, 509 N.E.2d 1226.

These considerations, among others, led the New York Court of Appeals to conclude that petitioner's third confession "was obtained from a juvenile after lengthy custodial questioning and that it was given under circumstances which suggest that it was induced by the hope of leniency." *Id.* at 33, 517 N.Y.S.2d 120, 509 N.E.2d 1226. Because that hope of leniency was itself induced by an express promise, the effects

---

**16.** Specifically, Judge Doyle found that "Peter was asked to relate to his mother the same story he had told Detective Palumbo." Hearing Op. at 8.

of which were never dissipated, the third confession was also erroneously admitted into evidence.

### Conclusion

The Temporary Commission of Investigation of the State of New York ("SIC") recently observed that, in contrast to other large suburban counties, the Suffolk County Police Homicide Division obtained and relied upon confessions and admissions in 94% of homicide cases prosecuted during the period relevant to this case.[17] The SIC went on to conclude that:

> [T]he result of Suffolk's unique incidence of confessions has been for officers to rely on confessions and neglect both routine investigative steps and proper scientific and technical evidentiary practices. The prevailing attitude has been that note-taking, forensic evidence, neighborhood canvasses and crime-scene searches are not important because ultimately a defendant will confess. Confessions are of course important, but usually insufficient, and they should not become the nearly exclusive method of developing homicide cases. With Suffolk's methods, the chances of the guilty going free are simply too high.

*Report of the Temporary Commission of Investigation of the State of New York,* April 1989, at 56.

The Suffolk County Police here deliberately violated the Constitution of the United States and the laws of the State of New York to obtain a confession. They did not develop any significant additional evidence against petitioner. Because of the manner in which they conducted the investigation into the death of John Pius, which the SIC found was characteristic of conduct long tolerated by responsible officials of the Suffolk County Police Department and the District Attorney's Office,[18] Peter Quartararo may go free after serving only nine years of a nine year to life sentence. Unfortunately, it is a result that is unavoidable because each of petitioner's confessions were improperly obtained and erroneously used against him at his trial.

Accordingly, the petition for a writ of habeas corpus is granted and respondents are directed either to retry petitioner or to release him within ninety days of this order. The order is stayed pending appeal on the condition that, within seven days of the date of this order, respondents file a notice of appeal and a motion for an expedited schedule for the prosecution of the appeal.

---

**17.** One study cited by the SIC "compared 361 Suffolk homicide defendants from 1975 to 1985 to 700 cases from six other large suburban counties, Suffolk's 94% confession rate far exceeded the 54% to 73% rate in the six other jurisdictions (*Newsday,* 12/7/86, p. 27)." *Report of the Temporary Commission of Investigation of the State of New York,* April 1989, at 55 n. *.

**18.** The SIC specifically found that:

> *The Suffolk County Police Department and District Attorney's Office engaged in and per-*

*mitted improper practices to occur in homicide prosecutions, including perjury, as well as grossly deficient investigative and management practices.* Because of credibility problems with prosecution testimony, including police testimony, and other defects in homicide prosecutions, guilty persons may well have been allowed to go free.

*Report of the Temporary Commission of Investigation of the State of New York,* April 1989, at 28 (emphasis in original).