■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL QUARTARARO and PETER QUARTARARO, Appellants.— Appeals (1) by defendants from two judgments (one as to each of them) of the County Court, Suffolk County (Doyle, J.), both rendered June 9, 1981, convicting each of them of two counts of murder in the second degree on indictment No. 2678/79, upon jury verdicts, and imposing sentences, and (2) by defendant Michael Quartararo from a judgment of the same court, rendered December 9, 1981, convicting him of burglary in the third degree on indictment No. 595/81, upon his plea of guilty, and imposing sentence. The appeals bring for review the denial, after hearings, of those branches of defendants' pretrial motions as sought suppression of statements (Doyle, J., as to indictment No. 2678/79 and Albanese, J., as to indictment No. 595/81).

Judgments affirmed.

At approximately 8:15 P.M. on the evening of April 20, 1979, 13-year-old John Pius, Jr., was given permission by his father to leave their house in Smithtown for a brief test drive of his newly repaired bicycle. Approximately 10 minutes later, John was seen by a neighbor riding his bicycle in the direction of Dogwood Elementary School. It was the last time he was seen alive.

At approximately 1:00 P.M. in the afternoon of April 21, 1979, John's body was found in a forested area near the school. In a subsequent autopsy, it was determined that the cause of death was traumatic asphyxia which resulted from the presence of six stones lodged in John's mouth, five above and one below the tongue, which blocked his air passages. In addition, trauma to John's body and a sneaker mark on his cheek were

determined to be consistent with a person or persons standing on his throat and then placing the rocks in his mouth.

Various police officers testified at the suppression hearing that Peter Quartararo voluntarily consented to submit to police questioning as a possible witness from about 1:45 P.M. to 6:30 P.M. on April 28, 1979 and that Peter had not been considered a suspect. As Peter was two days shy of his 16th birthday, he was taken to the juvenile aid room of the Fourth Precinct of the Suffolk County Police Department. The police considered three youths named O'Neil, Sparling and St. Denis as suspects, and asked Peter if he had witnessed anything done to Pius by the other three. He was asked not to cover up for his friends. Peter was not restrained or handcuffed, was never questioned by more than two detectives, and was left alone for periods of time. He did not request to leave.

Detectives Palumbo and Leonard conversed with him in the juvenile aid room in normal conversational tones; no threats were made. Peter made no requests for food or a telephone; his request to use the men's room was honored. Peter was a high school student of apparently normal intelligence.

Peter told the officers that on the evening of April 20, 1979, he, his brother Michael, Thomas Ryan and Robert Brensic had taken some beer and driven to the Dogwood Elementary School. The youths then proceeded to the nearby Dogwood development and stole a minibike. Peter conceded that John Pius, Jr. had ridden by on his bicycle just as the minibike was being placed in the trunk of Ryan's automobile. With Detective Palumbo urging that he perhaps did see something more, Peter implicated Thomas Ryan and Robert Brensic in the murder of Pius. Peter alleged that Ryan and Brensic had run after Pius, leaving Peter and his brother Michael alone for 15 to 20 minutes. When they returned, they related that in an effort to "shut him up", they had shoved rocks down Pius's throat.

At approximately 5:30 P.M., in preparation of Peter Quartararo's giving a statement as to Ryan's and Brensic's participation in the murder of John Pius, Jr., Detective Palumbo, in order to obtain a better understanding of the site of the crime, asked Peter if he would mind going to the school with him and showing him the area. With Peter Quartararo's consent, Detectives Palumbo and Leonard proceeded to the Dogwood Elementary School with him.

Along the way, Peter indicated where Ryan's car had been parked while Robert Brensic went to steal the minibike. At

the school, Peter related first that he stayed in the car while Brensic and Ryan left, but soon conceded that he and his brother Michael had left the car as well, had run a distance behind Ryan and Brensic, and had watched Ryan and Brensic fight with Pius and kill him by shoving rocks down his throat.

At about 6:30 P.M. Peter further admitted that his brother Michael had assisted in bringing John Pius, Jr.'s bicycle towards the forest and that he, along with Ryan and Brensic, had assisted in dragging Pius's body across the macadam playground towards the woods and that they all had covered him with logs, leaves and sticks. In response to Peter's concern that Ryan and Brensic would have to find out about his "ratting" them out, he was advised by Detective Palumbo that the others would have to know. At that point, Peter Quartararo stated, "I might as well tell you. Mike and me helped— Mike and me chased Pius, too. We all stuffed rocks in his mouth, hid the body." According to the detective, Peter related that "[i]t happened so quick. Brensic told Pius not to say anything about the mini-bike, Pius said he wouldn't say anything about the mini-bike." The next thing he knew, "Rob pushed Pius and they all started fighting with him. He was screaming * * * and Rob said, 'Shove rocks in his mouth to shut him up' ".

Detective Palumbo then told Peter to stop speaking and advised him of his *Miranda* rights. Peter waived his *Miranda* rights, indicated that he did not wish to call either a lawyer or his mother, and indicated that he wished to continue speaking with the police.

On the way back to the police station, Peter gave further statements, including a tape-recorded confession. Peter's mother arrived at the police station at 8:35 P.M. *Miranda* warnings were again given and, in his mother's presence and at her urging, Peter gave a detailed confession as to how he and Michael participated in Pius's murder by beating him and shoving rocks down his throat.

The hearing court found, *inter alia,* that Peter had not been in custody at any point in time prior to 6:30 P.M., that Peter spontaneously "blurted" out at 6:30 P.M., that he and his brother Michael had been involved in the murder, that the tape-recorded statements would have to be suppressed due to a failure to comply with Family Court Act § 724, and that Peter's final statements made with his mother present followed his proper receipt and waiver of his *Miranda* rights. We agree with that determination. This court has noted that: "It is well settled that whether a defendant was in police custody

and was therefore not free to go is not determined by the individual defendant's subjective beliefs; rather, the determinative test is 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position' *(People v Yukl,* 25 NY2d 585, 589, cert den 400 US 851; see *Matter of Kwok T.,* 43 NY2d 213, 219-220). Further, in reviewing the hearing court's findings that there existed no custodial interrogation and that proffered statements were voluntarily made, the hearing court must be afforded great deference *(People v Yukl,* 25 NY2d 585, 588, *supra)* because it had the opportunity to see and hear the witnesses (see *People v Prochilo,* 41 NY2d 759, 761). Issues of credibility are primarily to be determined by the hearing court *(People v Armstead,* 98 AD2d 726), and, in the event the proof permits the drawing of conflicting inferences, the choice is for the trier of the facts and should be upheld unless unsupported by the evidence *(People v Vail,* 90 AD2d 917, 918; see *People v Leonti,* 18 NY2d 384, 390, cert den 389 US 1007)" *(People v Oates,* 104 AD2d 907, 910).

In this case, the hearing court credited the police officers' testimony that Peter voluntarily consented to police questioning as a witness, that he was not considered a suspect, that he was not restrained in any way, and that no threats were made. Thus, the hearing court's finding that Peter was not in custody until he made an inculpatory statement at 6:30 P.M. should be upheld.

Peter's final statements, made around 8:35 P.M., after his mother's arrival and after again being given *Miranda* warnings, in which he again confessed and then recanted his confession, were also properly held admissible. It could not be successfully argued that these final statements were "tainted" by the earlier statements made in Palumbo's car since, as noted by the hearing court, Peter's "final set of statements are as readily derived from the admissible statements [the 6:30 P.M. confession] as they are from the statements held inadmissible herein".

In addition, there was a pronounced break in the interrogation between Peter's statements which were made to Palumbo in Palumbo's car shortly after 6:30 P.M. and the resumption of questioning at the police station at 8:35 P.M. in Peter's mother's presence *(see, People v Chapple,* 38 NY2d 112). Thus, Peter's statements, as outlined above, were properly admitted into evidence.

Defendant Michael Quartararo argues that the trial court

erred in denying his applications for a separate trial. Michael contends that he was prejudiced by the introduction into evidence of the confessions of his brother which implicated him as well. We disagree.

We note at the outset that since Peter testified at trial, Michael's right to confront witnesses against him was not impaired. Thus, the rule of *Bruton v United States* (391 US 123) does not apply where one codefendant confesses and testifies at the joint trial *(People v Anthony,* 24 NY2d 696) even if, as here, that codefendant testifies solely to proclaim his innocence and to renounce his confession *(Nelson v O'Neil,* 402 US 622; *People v Payne,* 35 NY2d 22).

Apart from *Bruton (supra),* there exists the problem of the possible prejudice to Michael which may have resulted from the jury's hearing Peter's confessions implicating his older brother. However, as noted by the Court of Appeals: "Nevertheless we may discount the possibility of real prejudice when the defendant himself has made a statement which is almost identical to the codefendant's *(People* v. *Snyder,* 246 N. Y. 491, *supra;* cf. *People* v. *McNeil,* 24 N Y 2d 550) or when the independent proof of the defendant's guilt is substantial *(People* v. *Fisher,* 249 N. Y. 419, *supra).* Under these circumstances, there is little likelihood that the jury has found the defendant guilty on legally insufficient evidence or found it necessary to use the codefendant's statement as a guide for resolving ambiguities in the People's case against the other. For this reason the general rule is that 'The mere existence of confessions and the possibility of their introduction in evidence do not necessarily require separate trials.' *(People* v. *Fisher, supra,* at p. 424). But it also explains why 'In a case where, without the existence of a confession by one defendant, the evidence against another would be too weak to justify a conviction or even where a conviction would be doubtful, our review of the judgment would compel us to conclude that an abuse of discretion had been committed.' *(People* v. *Fisher, supra,* at pp. 427-428.)" *(People v Payne,* 35 NY2d 22, 27-28, *supra).*

No problem arises where the implicated defendant's admissions are "close enough" to the codefendant's confession, "without being mirror images", so as to make the probability of prejudice " 'negligible' " *(People v Berzups,* 49 NY2d 417, 425).

As noted above, Peter had stated that he, his brother and others had killed the victim by shoving rocks down his throat.

They feared that, as he had come across them stealing a minibike, he would go to the authorities.

Michael's confessions were attested to by various friends. Thus, according to several witnesses, in the summer of 1979 Michael was asked "How could you kill a kid like that, shoving rocks down his throat". Michael replied, "If you were drunk and if you didn't want to get caught, you would do the same thing". On another occasion, when asked by a friend if he was still in trouble with the law, Michael replied "No. They f____ it up. They'll never catch us".

According to high school student David O'Brien, Michael admitted that because Michael and his friends had feared that John Pius, Jr., would go to the police after witnessing the theft of the minibike, "[t]hey ran after him, up to the school, and they beat him up, and they kicked him. They stepped on his face, and he then took the bike and he put it someplace".

Finally, Michael's girlfriend, Gwen Fox, related that in July or August 1979, she asked Michael if he had killed John Pius, Jr. He responded "yes". When she then asked if he really killed John Pius, Jr., Michael replied sarcastically "I don't care if you don't believe me. I did it" or "I don't care if you don't believe me. I killed him". Additionally, Ms. Fox related a conversation she heard among Brensic, Peter and Michael Quartararo in which, in "fooling around" conversation, they said "Stomp on him, throw rocks down his throat".

Thus, we conclude in the case at bar that while Peter's confessions were somewhat more detailed than Michael's, they were "almost identical" *(People v Payne, supra,* p 27) or "close enough" *(People v Berzups, supra,* p 425) on the essential points so as to render the probability of prejudice negligible.

We further note that, contrary to Michael's assertions, he was afforded the effective assistance of counsel *(see, People v Baldi,* 54 NY2d 137; *People v Wagner,* 104 AD2d 457). We have considered defendants' other assertions and find them to be lacking in merit. Bracken, J. P., O'Connor, Rubin and Kunzeman, JJ., concur.