Michael QUARTARARO, Plaintiff,

v.

Patrick HOY, Area Supervisor; Philip Deluca, and John Callender, Senior Parole Officers; Thomas A. Coughlin, Commissioner of the New York State Department of Correctional Services; James F. Recore, Director of Temporary Release Programs; Brian Fischer, Superintendent of Queensboro Correctional Facility; William Lester, Senior Counselor and Temporary Release Chairman; Rudolph F. Jeffries, Correction Counselor, as employees of the Department of Correctional Services, Defendants.[1]

No. 93–CV–4059 (JS)(MDG).

United States District Court,
E.D. New York.

Sept. 25, 2000.

1. The caption has been amended based on the Court's prior orders and to conform with the parties' stipulation of the parties as contained in the Joint Pre–Trial Order ("JPTO") approved by the Court on September 7, 1999.

Beth G. Schwartz, James A. Cohen, Lincoln Square Legal Services, Inc., Fordham University School of Law, New York City, for Plaintiff.

Rebecca Ann Durden, Assistant Attorney General, New York State Department of Law, New York City, for State DOCS and Parole Defendants.

### MEMORANDUM & ORDER

SEYBERT, District Judge.

By Order dated June 25, 1999, the Court granted in part and denied in part the defendants' motion for summary judgment, and granted plaintiff Michael Quartararo's ("Quartararo" or "plaintiff") motion for summary judgment on his procedural due process claim. The Court further held that defendants Thomas A. Coughlin and James F. Recore were entitled to qualified immunity, and dismissed all claims against these two defendants, except those claims that seek declaratory or injunctive relief. The Court also dismissed all claims against defendant Enoc Esteves because no evidence had been presented of Esteves' personal involvement in the due process violation. The Court reserved decision on the objective reasonableness prong of the remaining defendants' claim to qualified immunity, but held that the law was clearly established at the time of the constitutional violations.

The defendants subsequently moved for reconsideration of the June 25, 1999 Order. Specifically, defendants contended that the Court misapprehended their Rule 56.1 Counter–Statement, and as a result, erroneously granted Quartararo's motion for summary judgment on the due process claim. *See Quartararo v. Catterson,* 73 F.Supp.2d 270, 272–73 (E.D.N.Y.1999) (*"Quartararo II"*). The Court rejected defendants' arguments and held, inter alia, that defendants had failed to raise a genuine issue of material fact regarding defendants' failure (1) to provide Quartararo with the constitutionally required statement of actual reasons for his removal from the Temporary Work Release Program ("TWRP") and (2) to provide Quartararo with the constitutionally required minimum of twenty-four hours notice of the Temporary Release Committee ("TRC") hearing, a proceeding that resulted in Quartararo's removal from the

TWRP. *See Kim v. Hurston,* 182 F.3d 113, 117, 119–20 (2d Cir.1999). The Court reiterated its prior holding that Quartararo's due process rights had been violated by the defendants when he was summarily taken from the program. *See Quartararo II,* 73 F.Supp.2d at 273–76.

The Court also repeated what had been said at oral argument on the original motions regarding the qualified immunity defense. *Id.* at 276 n. 4. That is, the Court had held that the due process requirements mandated by the Constitution before an inmate could be removed from temporary work release had been clearly established since at least 1978. *See id.* at 273 (citing *Kim,* 182 F.3d at 117). However, the Court initially was of the view that the second prong of the qualified immunity analysis—whether the defendants' actions in removing Quartararo from the TWRP were objectively reasonable—was a question to be resolved at trial by a fact finder. *Id.* at 276 n. 4.

Consequently, the parties submitted their joint pre-trial order and a trial date was set for January 2000. However, as the trial date approached, both parties evaluated their positions and wrote the Court to express their shared view that qualified immunity, even under the circumstances of this case, was a matter of law for the Court to decide. *See* Letter from James A. Cohen, Esq., and Beth G. Schwartz, Esq., dated December 22, 1999 *and* Letter from Rebecca Ann Durden, Esq., dated January 4, 2000. The parties both argued that the Court should resolve the qualified immunity issue in their favor as a matter of law. *Id.* Additionally, both parties apparently waived their right to a jury trial on damages, as both parties submitted argument to the Court on possible remedies should the Court find that defendants were not protected by qualified immunity. *See id.; see also* Letter from Rebecca Ann Durden, Esq., dated January 20, 2000.

As a result of the parties' agreement that objective reasonableness is a question of law, and their agreement that the Court should decide the damages issue (in the event damages or injunctive relief is warranted), the Court canceled the scheduled trial and took the issue under consideration as part of the parties' previously-filed cross-motions for summary judgment. Therefore, after seven years of litigation, the sole issue before the Court is whether the actions of the remaining defendants (except Coughlin and Recore) regarding plaintiff's removal from the TWRP were objectively reasonable. If the answer to this question is yes, then judgment must be entered for the defendants on the due process claim. If the answer is no, then the Court must decide the appropriate remedy for the constitutional violation and decide whether future proceedings are warranted to fix an amount of damages, if any.

Having taken the opportunity to review, once again, the circumstances surrounding plaintiff's abrupt removal from the TWRP in February 1992, the Court reiterates that the defendants violated plaintiff's due process rights. The Court holds that the defendants' actions on and around February 12, 1992 were not objectively reasonable. Therefore, the defendants are not entitled to qualified immunity. The defendants' motion for summary judgment on this ground is denied in its entirety, and plaintiff's cross-motion for summary judgment is granted in its entirety.

As discussed below, the Court also holds that the deprivation of Quartararo's liberty was directly caused by the constitutional violations. As a result of this determination, the Court shall order that plaintiff be reinstated to the TWRP, *nunc pro tunc,* with identical restrictions, rules, freedoms and conditions that were applicable to him prior to his removal from work release. Finally, the Court shall direct the parties to appear for a hearing on damages.

## I. Background

The facts of this case have been amply set forth in the Court's prior Memoranda

and Orders. *See Quartararo v. Catterson,* 917 F.Supp. 919, 926–29 (E.D.N.Y.1996) (*"Quartararo I "*); *Quartararo II,* 73 F.Supp.2d at 271 n. 2. Nevertheless, a recital of the parties' statement of stipulated facts, as set forth in the JPTO, will facilitate a discussion of the legal conclusions drawn from these undisputed facts. Aside from citation to cases, and except where otherwise noted, these facts have been taken exclusively from Schedule C of the JPTO, paragraphs one through sixty.

Plaintiff Michael Quartararo has been incarcerated within the New York State Department of Correctional Services ("DOCS") from 1981 until 1988, again from 1990 until December 1998, and again from November 1999 to the present. Quartararo was tried and convicted of the murder of John Pius in 1981 and was sentenced as a juvenile offender to an indeterminate term of imprisonment of nine years to life. Quartararo's first conviction was affirmed in state court, *People v. Quartararo,* 113 A.D.2d 845, 493 N.Y.S.2d 511 (2d Dep't), *leave denied,* 66 N.Y.2d 921, 498 N.Y.S.2d 1036, 489 N.E.2d 781 (1985). However, by decision dated February 9, 1988, the United States District Court for the Eastern District of New York, Korman, J., granted Quartararo's petition for a writ of habeas corpus, reversed his conviction, and ordered a new trial. *See Quartararo v. Fogg,* 679 F.Supp. 212 (E.D.N.Y.), *aff'd without opinion,* 849 F.2d 1467 (2d Cir. 1988). Judge Korman ordered Quartararo's release on bail pending a new trial.

Quartararo remained on bail from February 1988 through February 1990. During that time he had no conflicts with the law.

In 1990, Quartararo was retried and reconvicted on the original 1979 indictment, and on May 30, 1990 he again was sentenced to an indeterminate term of imprisonment of nine years to life. The second conviction was appealed, but the appeal was denied. *People v. Quartararo,* 200 A.D.2d 160, 612 N.Y.S.2d 635 (2d Dep't), *leave denied,* 84 N.Y.2d 939, 621 N.Y.S.2d 536, 645 N.E.2d 1236 (1994). However, once again by decision of the United States District Court, Quartararo's petition for a writ of habeas corpus was granted. *Quartararo v. Hanslmaier,* 28 F.Supp.2d 749 (E.D.N.Y.1998). As a result of that decision, Quartararo was released on bail in late December 1998. Subsequently, the United States Court of Appeals for the Second Circuit reversed the district court's decision. *Quartararo v. Hanslmaier,* 186 F.3d 91 (2d Cir.1999). Quartararo's bail then was revoked and he surrendered to DOCS in November 1999. Quartararo's petition for a writ of certiorari was denied by the Supreme Court. *Quartararo v. Hanslmaier,* — U.S. —, 120 S.Ct. 1196, 145 L.Ed.2d 1100 (2000).

Turning back to the history of the present civil rights action, in 1991 the New York Correction Law and New York State regulations provided that inmates within two years of possible release who had not been convicted of escape or absconding were eligible for the DOCS Temporary Release Program. Quartararo's application for the program was subject to several levels of review before being approved. 7 NYCRR § 1900.4(b)-(n). In October 1991, plaintiff's application for temporary release was approved. Quartararo's Notice of Approval was dated October 21, 1991, and he began participating in the program in November 1991. Plaintiff successfully completed, without incident, two unescorted furloughs to his home in Suffolk County, a DOCS-approved residence, in November and December 1991.

On January 3, 1992, Quartararo was transferred to Queensboro Correctional Facility ("Queensboro") for participation in work release. Parole Office Kay Russell was assigned to Quartararo at Queensboro. Russell's immediate supervisor was defendant Senior Parole Officer Robert Callender. Defendant Senior Parole Officer Philip DeLuca did not have any supervisory authority over Russell.

On January 7, 1992, *Newsday*, the major Long Island newspaper, published an article entitled "John Pius Killer in Work Release." In this article, Suffolk County District Attorney (and former defendant in this action) James M. Catterson, Jr. expressed his opposition to Quartararo's participation in the TWRP. The former assistant district attorney who prosecuted plaintiff also was quoted in the article and seconded the opposition to plaintiff's work release participation.

When Quartararo arrived at Queensboro, he participated in an orientation program and was given a copy of the "Rules and Regulations Governing Temporary Release." Quartararo agreed to comply with all the applicable rules, regulations and restrictions. During his time in the temporary release program, Quartararo was never found guilty of, or even charged with, any misconduct or rule violation.

Among Quartararo's freedoms and restrictions were the following. First, Quartararo could not leave Queensboro without his work release identification card. *See* 7 NYCRR § 1903.2(c)(8). Moreover, he was required to report to his assigned parole officer once per week, and the parole officer periodically would visit Quartararo's home and job. Quartararo was allowed to carry cash, use public transportation, visit family and friends, go shopping, and go to restaurants. While he participated in the TWRP, Quartararo left Queensboro in civilian clothing four mornings per week to work full-time, and returned to Queensboro or his residence in the evenings. He lived in the community at his approved residence on furlough status from Friday to Monday. Quartararo spent approximately forty-eight hours per week in actual custody at Queensboro, and spent the remaining 120 hours per week outside the facility, living and working in the community. Quartararo's time in the TWRP counted toward fulfillment of his sentence. Importantly, once an inmate was found eligible for temporary work release, the inmate's removal from the program was governed by DOCS regulations. *See* 7 NYCRR § 1904.2.

Sometime after Quartararo's arrival at Queensboro, an individual at the Suffolk County District Attorney's Office contacted Queensboro and voiced opposition to his participation in work release. Such opposition to an inmate's participation in the TWRP by an individual in the District Attorney's Office was unusual.

On January 15, 1992, *Newsday* published an editorial entitled "Parole Board Should Heed Trial Judge in Pius Case." The editorial urged that the Parole Board, before whom Quartararo was shortly scheduled to appear for his first parole hearing, deny Quartararo's application for release on parole. Defendants admit that in January and February 1992 they were under pressure from the community, relatives of John Pius, victim's rights advocacy groups, and the Suffolk County District Attorney to remove Quartararo from the program.

On January 28, 1992, plaintiff received a telephone call at work and was asked to report back to Queensboro early. The following day, defendant Brian Fischer, Superintendent of Queensboro, ordered that Quartararo be confined to a second floor cell at Queensboro.

At that time, there were three types of inmate housing at Queensboro. First, there were dormitories for active work release program participants. Second, there was a restriction dormitory on the fourth floor, called "Four South," for participants on restriction or pending disciplinary action. Third, there were about eight secure individual cells on the second floor. Inmates housed on the second floor were locked in twenty-three hours a day, and there was no television, day room, telephone, or visiting. Only one hour of recreation was permitted for second floor inmates. Participants in the TWRP at Queensboro usually were housed in Four South, which was an open dormitory with a television, day room, and telephone access.

Shortly after being locked up in a second floor cell, Superintendent Fischer visited Quartararo and told him that an investigation was being conducted. On January 30, 1992, defendant Callender and defendant William Lester, Senior Counselor and TRC Chair, visited Quartararo in his cell in the Special Housing Unit. Callender and Lester asked Quartararo if he ever uttered threatening words directed toward Barbara Pius, John Pius' mother. Quartararo said "never," "absolutely no." Although not noted in the JPTO's recitation of stipulated facts, plaintiff was served with an Administrative Segregation Notice dated January 30, 1992 informing him that "behavior on [his] part may have constituted a threat to the community." Third Amended Complaint, Exhibit D. Quartararo refused to sign the form. *Id.*, Exhibit E.

That same day, January 30, Quartararo dashed off a letter to Superintendent Fischer seeking an explanation for his placement in restricted housing. Quartararo also asked that he be removed from the Special Housing Unit. On January 31, 1992, Quartararo wrote both to former defendant Raul Russi, Chair of the Division of Parole, and to defendant Coughlin, complaining about the manner he was being treated by DOCS and Parole personnel. On February 5, 1992, Quartararo again wrote to Fischer, asking why he was confined in the SHU, and again requesting both his release and an explanation for the recent events.

On behalf of Russi, former defendant Martin F. Horn sent a letter to Quartararo dated February 10, 1992. Horn told plaintiff that based on the Division of Parole's investigation, there had been no impropriety or misconduct by Parole personnel.

Coughlin responded to Quartararo by letter dated February 11, 1992. In what the Court considers vague terms, Coughlin told Quartararo that an investigation into allegations made against him was continuing. Coughlin wrote that after the results had been obtained and evaluated, a decision would be made regarding his suitability to remain in the TWRP.

Quartararo appeared before the Parole Board for his first parole hearing on February 11, 1992. Following the hearing, Quartararo's parole application was denied. Quartararo later brought a successful Article 78 proceeding challenging the February 11 determination denying him parole.

The following day, February 12, 1992, Quartararo was brought before a TRC composed of defendants Lester, DeLuca and Corrections Counselor Rudolph F. Jeffries. In February 1992, participants in the temporary release program who had been denied parole for twenty-four months automatically were referred to the TRC. Defendants admit that pursuant to DOCS regulations, program participants scheduled to appear before a TRC were entitled to twenty-four hours notice of the hearing, and to a statement of reasons for the referral to the TRC. *See* 7 NYCRR § 1904.2(i). Defendants also admit that Quartararo was *not* given twenty-four hours written notice of the February 12, 1992 TRC hearing.

Shortly after his February 12 TRC hearing, Quartararo's participation in the TWRP officially was revoked. Within hours of the TRC hearing, Quartararo was transferred from Queensboro to an upstate prison. *See Quartararo II*, 73 F.Supp.2d at 274–75.

In February 1992, TRC hearings for TWRP participants who had been denied parole were tape recorded. DOCS has no official written policy regarding the destruction of tape recordings of TRC hearings. According to a June 4, 1998 Affidavit of Superintendent Fischer, there is no record of when or if the tape recording of Quartararo's February 11, 1992 TRC hearing was destroyed. According to the same affidavit, DOCS personnel searched for the missing tape twice, once in 1995 and again in 1998, but could not locate the tape.

Finally, at the time these events occurred, New York Correction Law did *not* prohibit individuals who had been convicted of murder from participating in the temporary release program. However, in 1994 the statute was amended. The amended Section 851 of the Correction Law now provides that inmates convicted of homicide offenses are not eligible for the temporary release program.[2] N.Y. Corr. Law § 851.2; *see also Vargas v. Pataki*, 899 F.Supp. 96, 98 (N.D.N.Y.1995) (holding that Equal Protection Clause was not implicated where inmate was rendered ineligible for temporary release by amended § 851.2, even though other inmates who were convicted of homicide offenses and who already were participating in the program were not removed from temporary release upon the effective date of the amendment).

However, the 1994 legislation contains a sunset provision. That is, the definition of "eligible inmate" is set to change again, effective September 1, 2001. As of this date, absent action by the legislature, there will no longer be any statutory impediment to participation in work release by an inmate convicted of a homicide offense. The legislature simply has removed the restrictive language from the statute. *Compare* N.Y. Corr. Law § 851.2 (Effective until September 1, 2001) *with* N.Y. Corr. Law § 851.2 (Effective after September 1, 2001).

Again, except where noted and but for the inclusion of citations to legal authority, the facts related above have been agreed upon by both parties. The Court now proceeds to evaluate the objective reasonableness of the defendants' actions in light of the then-current law regarding inmates' removal from the temporary work release program.

## II. Defendants' Actions Were Not Objectively Reasonable

 Inmates participating in the temporary release program in New York State have a liberty interest that is protected by the Due Process Clause of the Fourteenth Amendment. *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir.2000); *Kim v. Hurston*, 182 F.3d 113, 115, 117–18 (2d Cir.1999); *Tracy v. Salamack*, 572 F.2d 393, 395–96 (2d Cir.1978) (per curiam); *Quartararo I*, 917 F.Supp. 919, 940 (E.D.N.Y.1996). Removal from temporary work release constitutes an "atypical and significant" deprivation of liberty. *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As a result, "prisoners are entitled to procedural due process before they are subjected to such a deprivation of liberty." *Friedl*, 210 F.3d at 84; *see also Kim*, 182 F.3d at 118 (holding that an inmate's removal from work release "require[s] compliance with at least minimal procedural due process").

 Prior to removal from temporary work release, due process requires that a participant be given (1) written notice of the alleged violation of the program's rules or conditions; (2) a statement of the actual reason why the inmate's removal from work release is being considered; (3) a report or summary of the evidence against him or her; (4) an opportunity to be heard and to present evidence; (5) advance notice of a temporary release committee hearing; (6) the right to confront and cross-examine adverse witnesses; (7) a TRC composed of neutral decisionmakers; and (8) a post-hearing written account of the actual reason for removal and a summary of the evidence supporting that reason. *Friedl*, 210 F.3d at 84–85 (quoting due process requirements mandated by the Supreme Court in the parole revocation context and holding that "similar requirements would logically apply to revo-

---

**2.** The amended subdivision two of § 851 states that "no person under sentence for … any homicide offense defined in article one hundred twenty-five of the penal law … shall be eligible to participate in a work release program." N.Y. Corr. Law § 851.2 (McKinney's 1987 and 2000 Supp.).

cation of work release"); *Kim,* 182 F.3d at 118–19 (holding that due process requires, at the least, notice of removal and a statement of actual reasons for the removal); *see also Doe v. Simon,* 221 F.3d 137, 139 (2d Cir.2000) (holding that, in the context of conditional release under N.Y. Penal Law § 70.40(1)(b), due process requires notice, an explanation, and a chance to challenge the conditions imposed); *Patterson v. Coughlin,* 905 F.2d 564, 568 (2d Cir.1990) (holding that, in the prison disciplinary process, due process requires the opportunity to call witnesses); *see generally Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (setting forth due process requirements in context of parole revocation). Additionally, removal from the temporary work release program does not comport with due process "'unless the findings of the [temporary release committee] are supported by some evidence in the record.'" *Friedl,* 210 F.3d at 85 (quoting *Superintendent, Massachusetts Correctional Inst. v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). These cases, particularly *Friedl* and *Kim,* seem to have put to rest a great deal of the confusion of recent years surrounding the process due to participants in the TWRP prior to their removal.

 In this case, defendants have admitted that Quartararo was not given twenty-four hours written notice of the TRC hearing held on February 12, 1992. JPTO, Schedule C, ¶ 54. This failure to provide adequate notice occurred despite DOCS regulations that specifically stated that program participants were entitled to twenty-four hours written notice. *Id.* ¶ 53 (citing 7 NYCRR § 1904.2(i)). These

same regulations also mandated that participants were entitled to a statement of the reason or reasons for referral to the TRC. *Id.* The Court previously has ruled that Quartararo was not given an adequate statement of reasons for his referral to the TRC, nor was he provided an adequate statement of reasons for his actual removal from TWRP. *See Quartararo II,* 73 F.Supp.2d at 275–76 (holding that the February 12, 1992 letter to plaintiff from defendant Lester, a letter plaintiff claims never to have received, was constitutionally insufficient).[3]

Additionally, Quartararo never was provided with adequate written notice of any alleged violation of the program's rules or conditions prior to the TRC hearing. *See* Third Amended Complaint, Exhibits E and F (letters from plaintiff to defendant Fischer); *Id.* Exhibit G (letter to plaintiff from defendant Coughlin, stating that the "investigation into allegations made against you is continuing."). Defendants have not presented any evidence to the contrary, and in fact admit that Quartararo was never charged with or found guilty of any misconduct or rule violation while in the TWRP. JPTO, Schedule C, ¶ 38.

Moreover, Quartararo was never given any sort of report or summary of the precise allegations against him, allegations which apparently prompted his initial physical removal from the TWRP and his confinement in the SHU on January 29, 1992. Although plaintiff was given the Administrative Segregation Notice, stating that his behavior may have constituted a threat to the community, there was nothing indicating what that threat was.

**3.** The Lester letter was insufficient because it stated only that Quartararo's removal from TWRP was being recommended because his continued participation was not in the best interest of the community since he had been denied parole a day earlier. *Quartararo II,* 73 F.Supp.2d at 275. This alleged statement of reasons differed substantially from the actual TRC report, which did *not* mention plaintiff's denial of parole. *Id.* at 275–76. With the

advantage of hindsight, the entire February 12, 1992 TRC hearing was rendered moot because of plaintiff's successful Article 78 challenge to his February 11, 1992 parole hearing. JPTO, Schedule C, ¶ 60. That is, but for the denial of parole—a determination later voided and then returned for a new hearing as a result of the Article 78 proceeding—Quartararo admittedly would not have been referred to the TRC in the first place.

Instead, on January 30, 1992, defendants Lester and Callender merely visited Quartararo in his cell and asked him if ever had made any threats against Barbara Pius. JPTO, Schedule C, ¶ 45. Plaintiff responded "never" and "absolutely no." *Id.* This interview also was attended by a parole officer Lonigan, but Quartararo's assigned parole officer, Kay Russell, was not present. *See* Affidavit of Robert Callender, dated July 22, 1998, Exhibit A. For some unknown reason, Russell—who presumably knew more about Quartararo than anyone else at Queensboro—was not permitted to speak with Quartararo while he was in the SHU. *See* Affidavit of Kay Russell, dated July 1998, ¶ 5. Although Quartararo was her assignment, Russell was not aware that plaintiff was being investigated for allegedly uttering threats against Barbara Pius. *Id.* Curiously, despite the investigation into the alleged threats—which as mentioned above provoked plaintiff's physical removal from the TWRP on January 29, 1992—defendants maintain that the only questions asked of Quartararo at his TRC hearing related to his feelings about having been denied parole; no mention was made to him at the hearing about the alleged threats. Defendants' Local Civil Rule 56.1 Statement, ¶¶ 29–30. Defendants never charged plaintiff with misbehavior or a violation because of the alleged threats. The investigation into the threats simply appears to have been abandoned.

The record also indicates that Quartararo was not given an opportunity to call witnesses or present other evidence at his TRC hearing. Defendants do not dispute that Quartararo was not permitted to call witnesses or present evidence.

In addition, there is some doubt about whether Quartararo actually was provided with neutral and detached decisionmakers at his TRC hearing. The committee was composed of defendants Lester, DeLuca and Jeffries. JPTO, Schedule C, ¶ 51. Lester, the TRC Chairman, had visited Quartararo in his cell on January 30, 1992

to inquire about the alleged threats against Barbara Pius. *Id.* ¶ 45. Despite this visit, Lester maintains that on February 12, 1992 he did "not recall having any information about an alleged threat at the time the TRC met to determine whether plaintiff should be removed from TRP." Affidavit of William Lester, dated July 22, 1998, ¶ 10. Instead, he "recall[s], specifically, that [plaintiff] was refereed [sic] to the TRC because of a twenty-four month parole hold." *Id.* Lester does not remember being present at the January 30, 1992 visit to Quartararo's cell. *Id.* ¶ 11. The contradictions and memory lapses noted in the record leave some doubt that Lester was, in fact, the type of neutral hearing officer contemplated by the Due Process Clause. *See Friedl*, 210 F.3d at 84–85.

Questions also exist about DeLuca's neutrality. DeLuca has affirmed that he interviewed Quartararo shortly after his arrival at Queensboro. Affidavit of Philip DeLuca, dated July 22, 1998, ¶ 8. During this conversation, DeLuca asked Quartararo about his crime. *Id.* A short time thereafter, DeLuca and Callender again visited plaintiff and spoke with him about his furlough plans. *Id.* ¶ 9. Because Quartararo was the focus of media attention, DeLuca questioned him about whether he had been approached by other inmates and whether he was apprehensive about his TWRP participation. *Id.* DeLuca admits that, prior to the February 12, 1992 TRC hearing, he "was vaguely aware that [plaintiff] was alleged to have threatened the mother of his victim." *Id.* ¶ 12. However, DeLuca maintains that "this information was not considered during the TRC hearing." *Id.* DeLuca "was not involved" in the investigation into the alleged threat. *Id.* ¶ 14. Rather, his knowledge about the supposed threat came from defendant Area Supervisor Patrick Hoy. *Id.* Considering DeLuca's knowledge of the alleged threat, and his personal and professional relationship with those investigating the threat, it is doubtful that his participation on the TRC complied with the due process

requirement that hearing officers be neutral and detached.

Finally, there is nothing in the record to indicate that the TRC's decision to remove Quartararo from the TWRP was based on any evidence at all. *See Friedl,* 210 F.3d at 85 (noting that findings must be supported by "some evidence in the record"). The tape recording of Quartararo's February 12, 1992 TRC hearing either has been destroyed or misplaced. Regardless of the reason, it cannot be found and has not been provided either to plaintiff or to the Court.

According to the DOCS regulations then in effect, an inmate could be removed from temporary release only where continued participation was (1) inconsistent with the safety of the community; (2) inconsistent with the best interest or welfare of the participant; or (3) if the participant has shown through his or her conduct that there is a substantial likelihood that he or she could not successfully adjust to or complete the program. 7 NYCRR § 1904.1(b) (attached to Affidavit of William Lester, dated July 22, 1998, Exhibit A). The regulations provided indications of unsuitability for continued participation, of which only subdivision 1904.1(c)(4), regarding threats made by the participant against members of the community, arguably applied to plaintiff. Defendants argue, however, that the alleged threats were not mentioned or considered at all during the TRC hearing.

After the TRC hearing, the TRC issued a brief report. Affidavit of James Recore, dated August 20, 1998, Exhibit A. The TRC stated that it was recommending that Quartararo be removed because "the best interest of the program, the community and inmate would not be served by the inmate remaining in Temporary Release. Due to the notoriety of the inmate's offense, and the current community's demonstrated concern, to place the inmate back into the community would place an undue level of pressure on him, and the program." *Id.* However, the regulations then in effect did not permit the TRC to consider either the "best interest" of the program, or the "best interest" of the community in making a determination whether an inmate should be removed from the TWRP.

Pursuant to its own regulations, the TRC was not permitted to consider the best interest of the temporary release program in deciding whether an inmate should be removed. The language simply does not exist in the regulations. Simply put, the TRC was not entitled to remove a participant for self-preservation purposes.

Nor was the TRC entitled to consider the "current community's demonstrated concern." The regulations did not permit an inmate's removal from work release based on community sentiment. In any event, the TRC did not elaborate on what it considered to be the community's "demonstrated concern." If there was any evidence of the community's concern—as opposed to the district attorney's concern or the local newspaper's concern—it does not exist in the TRC records provided to the Court. There was no finding that plaintiff's continued participation in the program was inconsistent with community safety.

Finally, although the TRC noted that Quartararo's continued participation "would place an undue level of pressure on him," the TRC did not point to any evidence supporting that conclusion. Because no transcript or tape recording of the hearing exist, the Court cannot determine whether in fact such evidence existed. The TRC report does not include any notes about the TRC members' observations of plaintiff's demeanor or mood, or anything else that might suggest that Quartararo was under pressure or stress. Plaintiff maintains that he did not feel that he was under any pressure or stress that would prevent him from successfully remaining in the program.

The February 12, 1992 letter from defendant Lester also fails to justify the

reasons for Quartararo's removal. This letter, which plaintiff claims he never received, states that it was "not in the best interest of the community and yourself in view of the fact that you have been held 24 months by the Parole Board." Affidavit of William Lester, dated July 22, 1998, Exhibit B. Again, the TRC's own regulations specify that the question is not the "best interest of the community" but rather whether an inmate's participation is inconsistent with community safety. Moreover, Lester's apparent justification for the "best interest" statement was plaintiff's denial of parole. But the mere denial of parole, by itself, was not sufficient to justify an inmate's removal from the TWRP. Affidavit of James Recore, dated August 20, 1998, ¶ 11.

In sum, defendants' reliance on the TRC report and the February 12 letter to plaintiff from Lester is misplaced. The alleged statement of reasons contained in those documents provides no evidentiary foundation for the removal decision. The defendants' reasoning is entirely circular: Quartararo allegedly was referred to the TRC because of his twenty-four month parole hold and he was removed from the TRC allegedly because of his twenty-four month parole hold. But defendant Recore, himself the Director of Temporary Release Programs, admits that the mere fact that an inmate had been held by the Parole Board for a twenty-four month period was not, by itself, a sufficient reason to remove the inmate from the TWRP. Affidavit of James Recore, dated August 20, 1998, ¶ 11.[4]

In sum, defendants failed to identify the evidence relied upon in making the determination to remove Quartararo from work release. Although the "some evidence" standard set forth in *Hill* is very deferen-

tial, there is virtually no evidence supporting or explaining the TRC's recommendation in this record; rather, the TRC report contains merely hollow and conclusory statements. *See Friedl,* 210 F.3d at 85.

■ Turning back to the relevant question, it is clear that the defendants' actions were not, as a matter of law, objectively reasonable. Qualified immunity protects defendants only "if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The defendants are entitled to qualified immunity "if when looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, it was objectively reasonable for the defendants to believe that their conduct or actions did not violate an established federally protected right." *Id.* (quotation marks, brackets, and citations omitted).

Based on the substantial due process violations detailed above, the Court cannot conclude that the defendants' actions were objectively reasonable. Rather, their actions were objectively unreasonable. Not only did the defendants fail to comply with their own regulations governing notice and a statement of reasons—regulations with which they presumably were familiar—they failed to provide any due process at all to this plaintiff. *See Quartararo II,* 73 F.Supp.2d at 274–75 (rejecting defendants' argument that this case amounts to nothing more than an "unfortunate set of timing" and setting forth the rapid pace of the events of February 11 and 12, 1992). Under the circumstances presented in this

---

4. A year and a half after plaintiff's removal, DOCS still believed that plaintiff was removed because of his two-year parole hit. A June 15, 1993 letter to plaintiff from Philip Coombe, Jr., First Deputy Commissioner at DOCS, stated that plaintiff's removal from work release was "based on [the] two year

hold by the Parole Board and did not consist of any rule violation." Plaintiff's Local Civil Rule 56.1 Statement, Exhibit 7; *see also* Transcript of Oral Argument, June 25, 1999, at 22–24 (noting that the only question asked of plaintiff at the TRC hearing was how he felt about having been denied parole).

case, there is no way that "officers of reasonable competence could disagree on the legality of the defendants' actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (quotation omitted). In so holding, the Court has not necessarily taken into account "the correctness of the defendants' conduct, but rather the objective reasonableness of their chosen course of action given the circumstances confronting them." *Id.* at 421.

Therefore, the defendants' motion for summary judgment on qualified immunity grounds is DENIED in its entirety. The plaintiff's cross-motion for summary judgment is GRANTED in its entirety.

## III. Remedy

The parties, having anticipated the Court's ruling on the qualified immunity issue, have briefed for the Court the issues surrounding the proper relief to which plaintiff is entitled in light of this decision. Quartararo seeks relief in the form of compensatory and punitive damages against all defendants except Coughlin and Recore. JPTO, Schedule F. He also seeks declaratory and injunctive relief against all defendants as set forth in the Third Amended Complaint. *Id.* Specifically, Quartararo seeks to be restored to the temporary work release program, *nunc pro tunc*, in accordance with the law in effect in February 1992. In other words, plaintiff contends that he is entitled to restoration of that which was unlawfully taken from him, namely his participation in the TWRP. Defendants' position is that plaintiff's remedy for the constitutional violations is, at the most, nominal damages in the amount of one dollar.

For the reasons that follow, the Court determines that Quartararo's removal from the TWRP was caused by the constitutional violations committed by defendants, and accordingly, nominal damages are not an appropriate remedy for plaintiff's unlawful removal from TWRP. Instead, the Court shall direct defendants to restore plaintiff to the TWRP, *nunc pro*

*tunc*, with same freedoms and restrictions he enjoyed prior to February 12, 1992, the date of the unlawful jurisdictional removal from the program. The Court also determines that plaintiff is entitled to an award of compensatory damages for the wages and other benefits lost as a result of his removal from the TWRP, as well as an award of damages for emotional distress caused by the constitutional violations.

A. Deprivation of Plaintiff's Constitutional Rights Was the Cause of his Removal from Temporary Work Release

▨ "It is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than a mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury." *Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir.1993). Unless a plaintiff proves that he or she has suffered an injury that resulted from a constitutional violation, the plaintiff is entitled only to nominal damages. *Id.* (citing *Carey v. Piphus*, 435 U.S. 247, 263, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978)); *see also Kim*, 182 F.3d at 121 (awarding only nominal damages for a "technical" violation that resulted in no compensable damages); *Patterson*, 905 F.2d at 568 ("even where a denial of due process has been followed by a liberty deprivation, unless the deprivation was caused by the violation the plaintiff is limited to nominal damages.").

▨ For claims brought under Section 1983, courts have the task of making decisions "concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of constitutional rights." *Carey*, 435 U.S. at 259, 98 S.Ct. 1042 (quotation and brackets omitted). Remedies for violations of constitutional rights must be "tailored to the interests protected by the particular right in question." *·Id.* The Supreme Court has recog-

nized the difficulty of this task. *Id.* at 257–58 & n. 12, 98 S.Ct. 1042.

In a typical Section 1983 case, as with most civil actions, the plaintiff bears the burden of proof on the causation issue. *Miner,* 999 F.2d at 660. On a procedural due process claim, the plaintiff must "show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed." *Id.* In very limited and extraordinary circumstances, this burden of proof may shift to the defendant. The burden will shift only where "the defendant prevents the plaintiff from obtaining access to evidence, and thereby makes it impossible for the plaintiff to carry the burden of proof." *Id.* (citing *Patterson,* 905 F.2d at 570). When this occurs, the defendant then bears the burden to prove that the deprivation of the plaintiff's property or liberty would have taken place even if defendant had complied with the requirements of due process. *Id.*

In *Patterson,* the Second Circuit held that the burden of proving causation had shifted to the defendants because the defendants were responsible for the absence of two witnesses, one of whom would have corroborated plaintiff's testimony. *Patterson,* 905 F.2d at 570. The burden shifted because the defendants essentially prevented plaintiff from proving his version of the events at issue. *Id.*

In this case, the causation question is whether Quartararo's removal from the temporary work release program would have occurred even if he had been provided with the protections required by the Fourteenth Amendment's Due Process Clause. At first glance, this action appears to be one of those rare cases where the burden of proof on this issue should shift to the defendants, mainly because the

defendants either have lost or destroyed the tape recording of the February 12, 1992 TRC hearing.[5] However, the Court need not resolve this issue because Quartararo has produced ample evidence that his removal from the TWRP would not have occurred had he been afforded the constitutional due process to which he was entitled.

Therefore, regardless of which party bears the burden of proof on causation, the issue must be resolved in plaintiff's favor. As discussed above, defendants made no effort at all to comply with their own regulations or with due process when they summarily removed plaintiff from the TWRP. Adequate notice of the TRC hearing was not provided; plaintiff was not entitled to present evidence; and significant doubt exists regarding the neutrality of two of the three TRC hearing officers. Finally, Quartararo was never given a constitutionally sufficient statement of reasons for his removal from work release, and the defendants' post-hoc justifications provide no basis for the removal. Therefore, although plaintiff has proved that the deprivation of his liberty was caused by the constitutional violations, if the burden were in fact that of the defendants, the defendants could not prove that Quartararo would have been removed from the TWRP even if they had complied with the constitutional requirements.

### B. Remedies: Compensatory and Punitive Damages

The Court rejects defendants' argument that, at the most, Quartararo is entitled to nominal damages in the amount of one dollar. *See* Letter from Rebecca Ann Durden, Esq., dated January 4, 2000, at 5. Defendants cite to the Second Circuit's decision in *Kim* as support for this conten-

---

5. At oral argument on the summary judgment motions, plaintiff's counsel represented that the only question Quartararo was asked at the TRC hearing was how he felt about being denied parole, and that he responded that he was not happy about it, but that he was going to continue in work release and do the best he could. Transcript of Oral Argument, June 25, 1999, at 23–24. Defendants' counsel agreed with that representation of what occurred at the hearing. *Id.* at 24.

tion. However, under the discrete facts in *Kim*, the Second Circuit found that the due process violation was merely a "technical" one and that the violation itself caused no compensable injury. *Kim*, 182 F.3d at 121. This result followed from the conclusion that the plaintiff had not demonstrated a causal link between the violation and plaintiff's alleged injury—in other words, the plaintiff had failed to prove that but for the constitutional violation, she would not have been removed from work release. In this case, as discussed earlier, Quartararo has proven that his injuries were caused by the constitutional violations, and the violations here cannot be classified as merely "technical."

▇ Instead, the Court determines that, consistent with *Carey, Patterson,* and *Miner,* plaintiff is entitled to an award of compensatory damages for the loss of income and benefits attributable to his unlawful removal from work release, as well as any emotional distress he may have suffered.[6] While plaintiff has affirmed that he earned $10 per hour working for Answermatic, Inc. while on temporary work release, there is no other evidence in the record at this time from which the Court possibly could fix an award of compensatory damages. Nor is the record sufficient to determine the period of time for which plaintiff is entitled to damages, nor is it sufficient to determine the amount of damages, if any, attributable to each defendant.

As a result, the parties shall appear before the Court for a hearing on damages. The hearing shall continue as long as necessary. During the hearing, the Court shall also hear testimony regarding whether the conduct of any or all of the individual defendants was so egregious or malicious so as to warrant imposition of punitive damages. The Court shall permit the parties to submit post-hearing briefs

on the amount of compensatory damages to be awarded, if any, and on the issue of whether punitive damages are warranted, and if so, in what amount.

Because plaintiff is a prevailing party, he also shall be entitled to an award of attorney's fees pursuant to 42 U.S.C. § 1988. The amount of fees shall be determined by the Court, upon separate motion by the plaintiff, following the damages hearing.

C. Remedies: Injunctive Relief

▇ Plaintiff seeks a permanent injunction requiring the defendants to restore him to the work release program in accordance with the law in effect in February 1992. Third Amended Complaint, ¶ M; *see also* Letters from James A. Cohen, Esq. and Beth G. Schwarz, Esq., dated December 22, 1999 and January 14, 2000. Defendants contend that Quartararo may not be restored to the TWRP because he is no longer eligible for the program based on the 1994 amendments to Section 851 of the Correction Law. The Court rejects the defendants' argument for the reasons that follow.

First, there is a significant difference between plaintiff's current ineligibility for initial placement in the work release program and his reinstatement in that program after unlawfully having been removed. The Supreme Court noted this difference in the context of parole release and parole revocation in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). If one substitutes "work release" for "parole release," and "revocation of work release" for "parole revocation," the Supreme Court's distinction is clear: "[t]he fallacy in respondents' position is that parole release and parole revocation are quite different. There is a crucial difference between being deprived

---

**6.** The Court previously has held that plaintiff also may be entitled to compensatory damages for his fourteen days of confinement in the SHU following his physical removal from

the TWRP on January 28, 1992, even though that confinement did not itself implicate the Due Process Clause. *Quartararo I,* 917 F.Supp. at 939–40.

of a liberty interest one has, as in parole, and being denied a conditional liberty that one desires." *Greenholtz*, 442 U.S. at 9, 99 S.Ct. 2100; *see also Lee v. Governor of State of New York*, 87 F.3d 55, 58–59 (2d Cir.1996) (holding that inmates who had never participated in temporary release program did not suffer atypical and significant hardship because they were not subjected to any change in their environment).

Similarly, there is both a factual and a legal difference between Quartararo's desire to have that which he lost restored, and having that which he never had be provided as a matter of first impression. Moreover, as in *Greenholtz*, there are significant differences between the inquiries involved in an initial determination whether an inmate is suitable for work release, as DOCS did here, and making a determination that a work release participant should be removed from the program. *See id.* at 9–10, 99 S.Ct. 2100. The Court's language in *Greenholtz* is instructive.

> The differences between an initial grant of parole [or work release] and the revocation of the conditional liberty of the parolee [or work release participant] are well recognized. In *United States ex rel. Bey v. Connecticut Board of Parole*, 443 F.2d 1079, 1086 (C.A.2 1971), the Second Circuit took note of this critical distinction: "It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." Judge Henry Friendly cogently noted that "there is a human difference between losing what one has and not getting what one wants." Friendly, "Some Kind of Hearing," 123 U. Pa. L.Rev. 1267, 1296 (1975).

*Id.* at 10–11, 99 S.Ct. 2100 (citations omitted); *see also Anthony v. Goord*, No. 97–CV–0316, 1997 WL 423092, at *2 (N.D.N.Y. July 17, 1997) (noting difference between due process claim of inmate seeking to participate in work release and claim of inmate whose ongoing participation was revoked). Similarly, given the Second Circuit's willingness, as discussed in *Friedl*, to analogize parole revocation to revocation of work release, it is apparent to the Court that there is a tremendous difference between an initial grant of work release and the revocation of that liberty after it has been given, enjoyed, and relied upon.

Contrary to defendants' argument, the 1994 amendment to the New York Correction law governing eligibility for work release does not bar the injunctive relief requested by plaintiff. As an initial proposition, allowing a state law to prevent a federal court from exercising its equitable powers to remedy a violation of the federal constitution would be an unhealthy and unwise precedent, since federal courts from time to time have interpreted the Constitution in ways that invalidated state laws that conflict with individual constitutional rights. *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Brown v. Board of Educ. of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[7]

Certainly the state is entitled to a great deal of deference in running its correctional facilities and managing its inmate population. *See Sandin*, 515 U.S. at 482, 115 S.Ct. 2293 ("federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment."). For this very reason, the Supreme Court has limited the application of the Due Process Clause to deprivations of liberty or property that "impose[ ] atypical and significant hardship[s] on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484, 115 S.Ct. 2293.

---

7. The Court does not pretend that the present case is by any means as significant or far-reaching as the cases cited. Rather, the cases are cited only in support of a fundamental principle of law. Nor does the Court intimate that the state law at issue here suffers from any constitutional defect.

But a federal court is entrusted to ensure that the state, in administrating its prisons, does not run afoul of the Constitution. U.S. Const. Art. VI, cl. 2 ("This Constitution ... shall be the supreme Law of the Land").

In a time when courts of the United States have, for example only, ordered a gigantic corporation to be divested in order to protect consumers and to remedy violations of federal statutory law, *see United States v. Microsoft Corp.*, 97 F.Supp.2d 59, 64 (D.D.C.2000); directed school districts to desegregate to remedy long-standing and entrenched violations of constitutional rights, *see Brown v. Board of Educ. of Topeka, Kansas*, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); and ordered state officials to transfer prisoners to other correctional facilities to remedy violations of civil rights, *see Inmates of Suffolk County Jail v. Eisenstadt*, 494 F.2d 1196, 1198–99 (1st Cir. 1974); directing the defendants to restore a single inmate to temporary work release seems to be a rather modest exercise of the equitable powers of the Court. Certainly such an order would impose a small degree of inconvenience on the defendants. But it is important to recognize that it was the defendants who approved plaintiff's participation in the work release program in the first instance, and it was defendants who unlawfully removed plaintiff from the program. Restoring plaintiff to temporary release will not place any particularly heavy burdens on the defendants or on DOCS, at least no greater burden than that contemplated by DOCS when plaintiff initially was approved for work release in October 1991. Nor does the Court believe that it improperly is injecting itself "in the day-to-day management of prisons." *Sandin*, 515 U.S. at 482, 115 S.Ct. 2293. The Court, pursuant to precedent, merely seeks to tailor the remedy to fit the violations. *See Carey*, 435 U.S. at 259, 98 S.Ct. 1042; *cf. Brennan v. Cunningham*, 813 F.2d 1, 13 (1st Cir.1987) (finding liberty interest in inmate's remaining at a halfway house and affirming district court's order reinstating him to that location).

In any event, defendants have not submitted any evidence to contradict plaintiff's contention that after the Correction Law was amended in 1994, inmates convicted of homicide offenses who were participating in the TWRP were permitted to remain in the program. In fact, defendants conceded this point at oral argument on the summary judgment motions. *See* Transcript of Oral Argument, June 25, 1999, at 12–13, 15–16. Nor is there any evidence that this plaintiff, had he remained in the program until the effective date of the amendment, would have then been removed as a result of the change in the law.

Additionally, although defendants have made no argument that plaintiff's restoration to work release would endanger the community, the Court has considered and rejected this possibility. *See Tracy v. Salamack*, 440 F.Supp. 930, 936 (S.D.N.Y. 1977) ("No one can reject cavalierly a suggestion that the security of the community may be jeopardized by a particular decision"), *aff'd as modified*, 572 F.2d 393 (2d Cir.1978) (per curiam). First, other than his conviction for a murder that took place over twenty-one years ago, the defendants have not drawn the Court's attention to any violations or misbehavior on Quartararo's part that might implicate the safety of the community. In fact, in a prior proceeding before the Court involving this plaintiff, an assistant district attorney of Suffolk County—representing the office that arguably has the most interest in the criminal aspect of this case—conceded in open court that Quartararo had been an ideal inmate and had not been subject to any disciplinary proceedings during his many years of incarceration. During that prior case, the Court also became aware that while on bail between December 1998 and November 1999, Quartararo had secured a position as a legal assistant with the New York City office of Skadden, Arps, Slate, Meagher & Flom, LLP, one of

the world's most prestigious law firms, and that the firm was entirely comfortable with Quartararo's status as a firm employee and was pleased with his work performance. *See* Docket Entry 62 relating to *Quartararo v. Hanslmaier*, 94–CV–5564 (noting letter to Rebecca Ann Durden, Esq. from Mr. Baer of Skadden Arps).

There is no adequate remedy other than to direct defendants to restore plaintiff to the temporary work release program with the same conditions and liberties he enjoyed prior to his physical removal from the program on January 28, 1992. For these reasons, the Court shall grant plaintiff's request for injunctive relief and order defendants to restore Quartararo to work release. *Cf. Tracy*, 440 F.Supp. at 936 (ordering DOCS defendants to reinstate class of 140 inmates who had been improperly removed from temporary work release program), *aff'd as modified*, 572 F.2d at 397 & n. 15.

IV. Conclusions and Orders

The plaintiff's cross-motion for summary judgment on the due process claim is GRANTED in its entirety. Defendants' motion for summary judgment on qualified immunity grounds is DENIED in its entirety.

The parties are ORDERED to appear for hearing on damages on Monday, November 27, 2000, at 9:30 a.m. The parties shall jointly advise the Court by letter within three weeks as to the number of days that will be required to complete the hearing.

The defendants are ORDERED to restore plaintiff Michael Quartararo to the temporary work release program, *nunc pro tunc*, within ten calendar days of this Order. Quartararo shall be under the same rules, restrictions, conditions and regulations imposed by DOCS and agreed to by plaintiff prior to being placed in temporary release by DOCS on October 21, 1991. Quartararo shall be entitled to the same liberties and freedoms he enjoyed as of January 28, 1992, the date of his physical removal from the program.

Additionally, the Court ORDERS that once Quartararo is restored to work release, he shall not be supervised or controlled by any person named as a defendant in this action.

The Court further ENJOINS defendants and other DOCS personnel from retaliating against plaintiff for having brought this action to vindicate the violation of his constitutional rights. The Court further ORDERS that DOCS may not receive any information or material from outside agencies, organizations or individuals, relating to plaintiff's work release status, unless plaintiff and/or his attorneys are notified of the receipt of such information or material, and providing plaintiff adequate opportunity to respond or reply to such information.

This Order shall not be construed as permitting plaintiff to remain on temporary work release indefinitely. He shall be subject to the relevant DOCS rules and regulations that are now lawfully in effect and that apply to all other temporary release participants. Nevertheless, the defendants and the Department of Correctional Services are ORDERED to comply with the due process requirements set forth in this order in the event plaintiff is subject to a future TRC hearing.

The Court shall retain jurisdiction over this matter to ensure the compliance of all parties.

SO ORDERED.